Robert D. SPRAGUE, et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION,
Defendant.

No. 90–CV–70010.

United States District Court,
E.D. Michigan, S.D.

Feb. 2, 1994.

Raymond C. Fay, Christopher G. MacKaronis, Hillary L. Pettegrew, Bell, Boyd & Lloyd, Washington, DC, J. Douglas Peters, David R. Parker, Charfoos & Christensen, Detroit, MI, for plaintiffs.

Robert F. Walker, Ethan Lipsig, Elliot K. Gordon, Paul, Hastings, Janofsky & Walker, Santa Monica, CA, David M. Davis, Daniel G. Galant, Gen. Motors Corp., Detroit, MI, and Terence V. Page, Birmingham, MI, for defendant.

### OPINION AND ORDER

FEIKENS, District Judge.

#### Table of Contents

|  |  | Page |
|---|---|---|
| I. | Background | 269 |
| II. | Issue Presented | 270 |
| III. | Contentions of the Parties | 270 |
| IV. | The Class Action | 271 |
| V. | History of Health Care and Early Retirement Benefits | 273 |
| | A. Health Care Benefits | 273 |
| | B. Early Retirement | 274 |
| VI. | Summary of Evidence Concerning Information Given To Early Retirees | 278 |
| VII. | Analysis | 299 |
| | A. Did GM Contract with the Early Retirees? | 300 |
| | B. What Evidence may be Relied on to Interpret the Contracts? | 301 |
| | C. Did the Contracts Include Health Care? | 306 |
| | D. What Health Care Benefits Were Promised? | 308 |
| VIII. | Conclusion | 319 |

## I. *BACKGROUND*

Beginning in 1974, and continuing at least through 1988, General Motors Corporation (GM or the Corporation) used various incentive programs to encourage early retirement by salaried employees who were otherwise ineligible for full retirement benefits. Generally, the programs targeted employees between the ages of 55 and 60. In some cases, employees younger than 55 were given the option of layoff followed by early retirement. Plaintiffs represent a class of GM salaried early retirees who claim that GM breached its contractual promise to provide them with unreduced lifetime health care benefits at no cost to them.

The early retirement offers made by GM were designed to reduce the overall number of salaried employees on GM's payroll. From 1974 to 1987 GM went through a series of reorganization and down-sizing programs of which early retirement was an integral part.[1] Some of the early retirement offers were directed to particular plants or divisions of GM; others were corporate-wide.

GM gave employees a strong incentive to retire early by offering enhanced retirement benefits. The nature and extent of those enhancements are the subject of this dispute. The early retirees claim that GM agreed to continue health care benefits at no cost to them throughout their retirement at the same level they received before retirement. GM denies this, and says that it promised only enhanced pension benefits.

Robert D. Sprague, together with 113 other named plaintiffs, filed a Complaint on August 8, 1989, stating that they represent a putative class of approximately 84,000 General Motors salaried retirees and their surviving spouses. The group was originally composed of both general and early retirees.

For purposes of this opinion, "general retirees" are those salaried retirees who voluntarily retired, either at age 65 or before, and were able to do so without GM's consent, pursuant to the terms of the General Motors Retirement Program for Salaried Employes. Under the Program, employees could retire without GM's consent as early as age 55 if they had at least ten years of service, and even earlier if they had worked for GM for thirty years or more. However, employees who took this type of early retirement received actuarially reduced or delayed pension benefits. General retirees also include employees who were involuntarily retired at GM's insistence, and those eligible for retirement due to total and permanent disability.

"Early retirees" include former GM salaried employees who voluntarily accepted one of GM's numerous early retirement offers made between 1974 and 1988. These retirements required the consent of both the employee and employer. All employees who retired prior to age 65 could be referred to as early retirees, and sometimes were in GM documents. This is true whether the employee voluntarily retired, was forced out by GM, or accepted a special early retirement offer. I will use the term in a narrower sense, as a generic term for all early retirees who accepted early retirement offers made by GM prior to 1988 that required both employer and employee consent.

Counts II and IV of the Complaint are its essence. In Count IV, plaintiffs complain that GM violated the terms of a contractual agreement it entered into with its early retirees when, in 1988, it modified certain health care benefits available to early retirees, by either reducing or eliminating them. Plaintiffs rely on principles of federal common law in support of this claim. In Count II, plaintiffs complain that GM violated the terms of its health care plan, and thus the Employee Retirement Income Security Act (ERISA) §§ 402, 502(a)(1)(B) and 502(a)(3), 29 U.S.C. §§ 1102, 1132(a)(1)(B) and 1132(a)(3), when it made these changes, because it had previously agreed not to adversely modify the health care benefits early retirees receive.

---

**1.** In 1974 GM employed approximately 150,000 salaried workers. By 1987, after the sale of several divisions, major reorganization, and numerous early retirements, the number of salaried employees was reduced to approximately 120,-000. (Trial Transcript (Tr.), Vol. VIII(A) at 35, 38.)

The Complaint also alleges breach of fiduciary duties in violation of 29 U.S.C. § 1104 (Count III), and promissory estoppel (Count V). Finally, it alleges that GM failed to maintain plan documentation as required by ERISA, 29 U.S.C. § 1102 (Count I), refused to supply information requested by beneficiaries in violation of 29 U.S.C. § 1132(c) (Count VI), and failed to comply with requirements for summary plan descriptions, 29 U.S.C. §§ 1022, 1024, 29 C.F.R. §§ 2520.102–2, 2520.102–3 (Count VII).

In late 1990 the parties filed cross-motions for partial summary judgment. GM moved for dismissal of Count II. Plaintiffs moved for summary judgment on behalf of certain early retirees on Counts IV and V. On July 29, 1991, I issued an Opinion and Order granting General Motors' motion in part, and denying plaintiffs' motion. *Sprague v. General Motors Corp.*, 768 F.Supp. 605 (E.D.Mich.1991). That opinion is incorporated herein by reference. I granted summary judgment as to general retirees, but denied it for early retirees. Finally, I dismissed Count III of plaintiffs' Complaint.

On November 4, 1991, I certified a class of approximately 50,000 salaried early retirees, over GM's objection. The class includes all salaried employees who took early retirement, or agreed to take early retirement, prior to March 1, 1988, or their surviving spouses. I designated four subclasses: (1) Early retirees who signed "long-form" statements of acceptance of early retirement; (2) early retirees who signed "short-form" statements of acceptance of early retirement; (3) early retirees who signed "statements of intent to retire"; and (4) early retirees who signed neither a statement of acceptance nor a statement of intent to retire.

The parties filed a second set of partial summary judgment motions in 1992. As to these *motions*, I concluded that the case should go to trial for subclasses (1) and (2) on Counts II and IV only. All other claims, other than Count III which had been previously dismissed, including a prayer for damages, were held in abeyance. I also denied plaintiffs' motion for a jury trial.

## II. *ISSUE PRESENTED*

Did GM, in the period from 1974 to 1988, contract with its early retirees to vest in them certain health care benefits by promising them and their spouses that such health care benefits would continue for their lifetimes, at no cost to the retirees and their spouses, in exchange for the acceptance by the early retirees of early retirement?

## III. *CONTENTIONS OF THE PARTIES*

Plaintiff class relies on the undisputed fact that their early retirements had to be mutually agreed to by both themselves and GM. Unlike the general retirees who had a right to retire under the ERISA plan, plaintiff class could not take early retirement unless GM agreed, and GM could not force early retirement unless the retirees agreed.[2] This mutual agreement was reflected in statements of acceptance early retirees were required to sign.

Plaintiff class contends that these statements of acceptance, by which they gave up lucrative jobs and in some cases released GM from any claims of unlawful termination, cemented a contractual agreement between themselves and GM for certain retirement benefits, including health care. GM argues that it never intended nor conveyed to its putative early retirees an intent to vest lifetime health care benefits as part of its early retirement offer. It contends that the offer consisted of nothing more than actuarially unreduced pension benefits. The various special early retirement programs were amendments to its retirement income benefit plan—a plan designed to provide retirement income, not health care. The health care program, it argues, was a separate and distinct ERISA plan. According to GM, it provided health care to retirees by virtue of the fact that they were retirees, not because they were *early* retirees. Thus, GM argues, the health care benefits were subject to the same

---

**2.** Some early retirees were eligible, at the time of their retirement, for a form of general retirement which did not require GM consent. However, if they had selected this form of retirement, their pension benefits would have been reduced.

terms and conditions, including GM's right to amend, as for general retirees.

Plaintiff class claims that early retirement was presented to its members as a special package deal that included health care, separate and distinct from the regular GM retirement program. They rely on information provided to them, both written and oral, at the time of retirement to establish their contract right to unreduced health care benefits. Because the statements of acceptance are facially ambiguous, they argue that this additional written and oral evidence must be considered to determine the full scope of the early retirement agreements. Any ambiguities, they argue, should be interpreted in their favor pursuant to the doctrine of *contra proferentem.*

During the many weeks of this bench trial, my courtroom was usually filled with GM early retirees. For the most part, they appeared content and physically fit. Of those who testified, some conceded that, even after the 1988 changes, they continue to enjoy a good health care program. I had to keep in mind that this was not the issue that brought them here. Even if GM continues to provide well for them in retirement, this could not excuse GM's breach, if indeed it had agreed with the early retirees to vest health care benefits at no cost to them. Likewise, the fact that GM needed to substantially reduce its salaried work force in the 1970's and 1980's in order to remain viable could not excuse a promise made to early retirees.

Throughout this litigation, plaintiffs have attempted to rely in part on health care promises made to hourly employees of GM. Plaintiffs argued that long-standing GM policy required that salaried retirees be treated at least as well as hourly retirees. I conclude that while this is interesting history, the special deal that the plaintiff class claims GM made with them must be considered only on the evidence applicable to it.

Some of plaintiffs' contentions could be analogized to the court-crafted principle known as the *Toussaint* doctrine. *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980). This principle in Michigan law holds that employment contracts ordinarily considered as terminable at will cannot be so terminated if the employer, by policy or communication, holds out to the employee that employment may not be terminated except for cause. I do not find the *Toussaint* doctrine applicable, but I do see a similarity. GM maintains that it reserved the right to terminate health care benefits at will. Plaintiffs argue, as in *Toussaint,* that a special deal precludes this. Whether the special deal that the plaintiff class claims was made precludes GM from modifying health care benefits, however, must be decided by principles of federal common law, not the Michigan common law.

## IV. THE CLASS ACTION

Before I consider these issues and contentions, I take up GM's renewed motion to decertify the class. At the close of trial, GM argued that evidence presented did not demonstrate the commonality and typicality of claims required for class certification by Federal Rules of Civil Procedure (Fed.R.Civ.P.) 23(a)(2) and (3). In the alternative, it asked that I exclude from the class those individuals who retired after GM's December 11, 1987 announcement that the health care plan would be changed, but before those changes were implemented on March 1, 1988.

By order dated November 4, 1991, amended April 9, 1992, I certified this case as a class action under Fed.R.Civ.P. 23(b)(2), to be maintained on behalf of all salaried retirees of GM who took early retirement, or agreed to take early retirement, prior to March 1, 1988, or their surviving spouses. Four subclasses were certified: (1) Those early retirees who signed long-form statements of acceptance of early retirement; (2) early retirees who signed short-form statements of acceptance of early retirement; (3) early retirees who signed statements of intent to retire; and (4) early retirees who signed neither a statement of acceptance of early retirement nor a statement of intent to retire. Persons who filed both a long-form and short-form statement of acceptance were certified to be in subclass (1). Persons who filed both a statement of intent to retire and a statement of acceptance were certified to be in subclass (1) or (2), as appropriate.

In accordance with the requirements of Fed.R.Civ.P. 23(b), I found that:

(1) The class is too numerous—approximately 40,000 [3] early retirees—for practical joinder of all its members;

(2) Questions of law and fact common to the class exist;

(3) The claims of the original 113 named plaintiffs who are early retirees are typical of the claims of the class as a whole; and

(4) The named plaintiffs will fairly and adequately protect the interests of the class.

I also made the following findings:

a. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy;

b. GM has acted on grounds generally applicable to the class, thereby making any final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole or with respect to subclasses as a whole; and

c. The prosecution of separate actions by the individual class members would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would as a practical matter be dispositive of the interests of other nonparty members.

On the basis of the evidence presented at trial, I reaffirm my findings regarding the composition and characteristics of the class.

■ GM argues that the evidence demonstrates that it did not treat members of the plaintiff class in a uniform manner. Plaintiffs rely heavily on a variety of forms given to potential retirees that lists benefits available in retirement. GM notes that these forms were often produced at local facilities, and do not contain uniform information. The forms vary over both time and location. Moreover, according to GM, many of the documents do not contain the compelling language concerning lifetime health care benefits on which plaintiffs rely. GM makes the same argument concerning information given to potential retirees in oral form. Plaintiffs argue, and I agree, that the information supplied to potential early retirees was consistent on key points.

GM's position is flawed for several reasons. First, it argues that the claims of the early retirees are highly individualized and, thus, not susceptible to resolution through class action. But in the same breath, GM also claims that it never promised *any* early retiree that his or her health care benefits would be cost-free during retirement. GM cannot have it both ways. Because it argues that no early retirees, between the years 1974 and 1988, were ever promised lifetime health care benefits without cost as an inducement to early retirement, its defense against plaintiffs' claims is uniform. Likewise, the claims made by the early retirees are uniform.

■ GM also argues that the witnesses plaintiffs produced at trial do not fairly represent the class as a whole. Representing the class of some 50,000 early retirees are 451 individuals. Three hundred and eighteen of these retirees fall into subclasses (1) or (2). During the discovery and class formation process, I suggested that discovery be limited to a random sample of 100 retirees. That sample was subsequently enlarged to 200 cases. Thereafter I permitted plaintiffs to add 251 self-selected class representatives, so that the total number became 451. GM was ordered to produce the personnel files of all 451. The self-selected retirees also filed affidavits with the court during pretrial proceedings. Of the 318 individuals from this group in subclasses (1) and (2), 145 were randomly selected; 173 were self-selected. Although plaintiff class presented numerous early retiree witnesses from the group of 318, none of them were randomly selected members of that group. Because of this, GM argues plaintiffs failed to present class-wide proof. I disagree.

As a group, the 318 individuals are representative of their respective subclasses and

---

3. Trial evidence demonstrated that the class is actually composed of approximately 50,000 early retirees or their surviving spouses. (*See* Plaintiffs' Exhibits (Pl.Ex.) 9 and 10.)

the class as a whole from the standpoint of the typicality and commonality of their claims, and from the standpoint of GM's action on grounds generally applicable to the class. Those who testified are representative of the class in terms of facilities in which they worked, time-frame, and types of early retirement. Moreover, plaintiff class does not rely exclusively on the testimony of their witnesses. Much of the documentary evidence comes from the personnel files of randomly selected retirees, as well as other sources. Finally, GM failed to produce any significant rebuttal evidence to demonstrate that the treatment of plaintiffs' witnesses was atypical.

GM confuses the class-wide proof necessary for plaintiffs to prevail with the construct of the class itself. I am satisfied that all of the requisites of Rule 23(b) are met and that decertification is not appropriate.

I also deny GM's request to restrict the class to those individuals who retired before December 11, 1987. The announcement on which GM relies accompanied a memo addressed to U.S. Personnel Directors dated December 11, 1987. (Defendant's Exhibit (Def.Ex.) 598.) The memo instructs the Directors to reproduce the announcement locally and distribute it to salaried employees. GM offered no evidence as to when or if this was actually done. Furthermore, the announcement, which does not mention health care until the third of four pages, does not contain detailed information. It merely indicates that deductibles and co-payments will be added, without any specifics. More important, the key date for class membership is not the actual date of retirement, but the date on which the statements of acceptance were signed. *See Seward v. B.O.C. Div. of General Motors Corp.,* 805 F.Supp. 623 (N.D.Ill.1992) (once statement of acceptance signed, employee could not refuse retirement).

Having certified the class, it is now necessary to determine whether the proof presented on behalf of the class preponderates in its favor. This requires an analysis of that proof, which follows in this opinion.

## V. HISTORY OF HEALTH CARE AND EARLY RETIREMENT BENEFITS

Before discussing specific information given to early retirees concerning their health care benefits in retirement, I will briefly describe the historical development of both health care benefits and early retirement at GM.

### A. Health Care Benefits

Prior to 1961, GM's salaried retirees were eligible for continued health care coverage, but only if they paid the full cost of the monthly premium. In 1961, the Corporation began paying one-half the cost of retiree health insurance premiums. (Tr. XII(B) at 35–36, Sherman.) And in 1964, GM assumed the "full cost of the basic hospital and medical expense coverages" for its salaried retirees.[4] (Def.Exs. 557, 558.) Surviving spouses of deceased retirees were allowed to continue coverage, but at their own expense, until GM began to pay the "full cost" for them in 1968. (*Id.;* Def.Ex. 565 at Exhibit A, pp. 4–5.) At the time of the 1964 changes, the basic health care program required a deductible or co-payment (the greater of $5 or 10% of the charge) for some "Class II" services, such as X-rays, electrocardiograms, and certain cancer treatments. (Def.Ex. 500 at 12.) In 1968, deductibles for outpatient services, except for psychiatric care, were eliminated. (Def.Ex. 565.)

Throughout the history of GM's health care program, some types of medical expenses incurred by employees and retirees have not been covered by the basic health care program. GM offered salaried employees and retirees an optional supplemental health insurance program, the Comprehensive Medical Expense Insurance Program (CMEIP), to cover some of these expenses. Program participants were covered for such services as doctor's office visits, blood work and ambulance service. (*See, e.g.,* Def.Ex.

---

**4.** Retirees who retire "voluntarily" (under provisions of the GM Retirement Program not requiring the Corporation's consent or approval) and who do not meet certain age and length of service requirements were, and continue to be, ineligible for health care coverages in retirement unless they pay the full cost of the premiums.

505 at 16.) However, they were required to pay at least part of the premium for these coverages, in addition to co-payments and deductibles. (*Id.*)

GM added prescription drug coverage to its basic health care program in 1969. A $2 co-payment was required. (Def.Ex. 565 at Exhibit A, p. 6.) Prescription drug coverage was expanded to include retirees in 1971. (Def.Ex. 568.) The co-payment was raised to $3 in 1976 (Def.Ex. 577 at Exhibit D, p. 3) and again to $5 in 1984 (Def.Ex. 593 at Exhibit F, p. 5).

In 1974, GM first offered dental coverage to its active salaried employees. (Def.Exs. 569–571.) It was extended to retirees in 1977. (Def.Exs. 575–577.) From the outset, covered dental services have required a co-payment of 15 to 50%, depending on the type of procedure utilized. (*See, e.g.,* Def.Ex. 569 at Exhibit A, pp. 9–10.)

In 1977 hearing aid coverage was offered to both active and retired employees; and vision coverage was offered to active employees, then extended to retirees in 1980. (Def.Exs. 575–577 and 581–583.) Vision coverage included "flat dollar co-payments" for both active and retired employees. (*See, e.g.,* Def.Exs. 575 at 7, 506 at 16–17.)

GM instituted a major revision of its health care program in 1985 when it became fully self-insured and established the "Informed Choice Plan." (Def.Exs. 591 and 593.) Under the Plan, participants were given the option, where available, of Traditional coverage, or a Preferred Provider or Health Maintenance Organization (PPO or HMO). The Traditional option operated almost identically to the insurance plan previously made available to employees.

In 1988 GM announced the modifications to its health care program that are the sub-

ject of this dispute.[5] (Def.Exs. 762, 763.) In a booklet entitled "New Dimensions in your GM Salaried Compensation Policies and Benefits," dated January, 1988, GM announced "Revisions to the Health Care Program which include increased employe cost-sharing and elimination of vision and hearing aid coverage, as well as expansion of covered medical services and increases in certain benefit maximums." (Def.Ex. 762 at 1.) The program amendments, effective March 1, 1988, added comprehensive deductibles and co-payments for Traditional option coverages (but not for the PPO or HMO options). Participants became responsible for an annual $200 individual or $250 family deductible for covered services. After the annual deductible, participants were responsible for 20% of the cost for most covered services, up to a maximum of $500. Annual out-of-pocket expenses for Traditional option participants could be as high as $700 for an individual, or $750 for a family. Several other changes were announced at the same time. For example, vision and hearing aid coverages were eliminated, although they were made available again in May 1988, retroactive to March 1, 1988, through CMEP, (Def.Ex. 764), and then restored into the basic health care coverages effective March 1989. (Pl.Ex. 63.) Changes were also made to CMEP. Deductibles were increased, chiropractic and allergy coverages were eliminated, and psychiatric coverage was reduced. (Def.Ex. 762 at 19.)[6]

### B. *Early Retirement*

Effective February 1, 1974, GM created a new form of retirement called "special early retirement." (*See* Def.Ex. 601, "General Motors Retirement Program for Salaried Employes.") Before and after the development of special early retirement, several other forms of retirement were available to GM salaried employees.

---

5. As of 1987, GM also eliminated the term "insurance" from its program. Thus, CMEP became known as CMEP, and basic coverages fell under the rubric of the GM Health Care Program for Salaried Employees.

6. Although some benefits were reduced or eliminated, others were improved. For example, hospice care was added as a covered expense, maximum annual benefits for outpatient mental health care were increased, prescription drug

coverage was expanded and the list of covered durable medical equipment and prosthetic and orthotic appliances was enlarged, and dental coverage improved. (Def.Ex. 762.) At the same time GM made these changes, it also unilaterally elected to increase retirement income benefits for salaried retirees, thereby alleviating some of the costs to retirees associated with the health care modifications. (Def.Ex. 763.)

In 1968, GM prepared a booklet entitled "Your GM Retirement Program for Salaried Employes in the United States" which describes several retirement options. (Def.Ex. 600). Normal Retirement is generally taken at age 65. Total and Permanent Disability Retirement is available for disabled employees with at least ten years of service. Employees between ages 60 and 65 with ten or more years of credited service can be "retired by GM," or retire under conditions "mutually satisfactory" to both GM and the employee. All retirees in these categories were eligible for full retirement pension benefits. Employees with ten or more years of credited service also had the option of taking voluntary retirement prior to age 65. However, pension benefits were reduced or delayed. Pension benefits were also reduced for those retired by GM (Corporation Option Retirement) between ages 55 and 60.[7]

Special early retirement was designed for employees between the ages of 55 and 60 with ten or more years of credited service. The retirement had to be "initiated by the Corporation, in the best interest of the Corporation, and agreeable to the employe." (Def.Ex. 660 at 4.)

The Chairman of the Corporation, R.C. Gerstenberg, issued a letter to General Managers of Divisions, Presidents of Subsidiaries, General Operating Officers, Group Executives, Staff Executives, and Heads of Staff Sections, dated January 10, 1974. (Def.Ex. 609.) The letter concerns changes, as approved by the Board of Directors, to the Retirement Program for Salaried Employes in the United States. "The modifications include ... liberalized early retirement features...." Chairman Gerstenberg noted that a second Chairman's letter would provide more detailed information on the modifications. (*Id.* at 2.) The follow-up letter, dated January 11, 1974, provides guidelines for the administration of early retirements. (Def.Ex. 610.) It identifies four types of early retirement, Mutually Satisfactory (for ages 60 to 64), Special Early (for ages 55 to 59), Corporation Option (for ages 55 to 64), and Employe Option. For both Mutually Satisfactory and Special Early retirements "a written statement from the employe indicating acceptance of management's recommendation" is required.[8] Special Early retirement "should *not* be imposed against the employe's desires." (*Id.* at 3, 4.) Furthermore,

> Retirement under the special early provisions of the amended Retirement Program may be granted *only* where such retirement is:
>
> 1. Obviously in the best interests of the employing unit and the Corporation;
>
> 2. Recommended by the employing unit to the employe; and
>
> 3. Agreeable to the employe.

(*Id.* at 3.) To satisfy the first criteria, "normally one of the seven conditions or circumstances listed for [Mutually Satisfactory retirement] would be present." (*Id.*) Those conditions include (1) a decline in the employee's performance, (2) a significant employee health problem, (3) technological obsolescence of the employee's skills, (4) reduction in work force necessary for the employee's operation, (5) reorganization of duties to improve efficiency of the operation, (6) consolidation of activities or a plant closing, and (7) employee on long-term layoff who has reached retirement age with only a remote prospect of reemployment. (*Id.* at 2.)

Chairman Gerstenberg does not mention health care benefits for early retirees. A letter dated January 16, 1974 from Vice President George B. Morris, Jr., addressed to the same group of managers and concerning the same subject, also fails to mention health care directly, though it gives detailed information on pension benefits. (Def.Ex. 611.) It does state that, "The level of retirement benefits and *other benefit plan treatment* under the new special early type of retirement will be the same as for Corporation option retirement at the same age." (*Id.* at 11, emphasis added.) Likewise, the Retirement Program plan documentation does not mention health care. (*See* Def.Ex. 601.)

---

7. Forced retirement for those in this age group required the approval of either the Executive or Finance Committee of GM.

8. The statement was not required for an employee-initiated Mutually Satisfactory retirement.

However, a letter addressed to General Managers, Personnel Directors and Staff Executives dated November 22, 1974 from Vice President Stephen H. Fuller, providing an update of Chairman Gerstenberg's January 11, 1974 letter, reemphasizes the need for mutual agreement for special early retirement, and attaches two sample statements of acceptance. (Pl.Ex. 409.) The letter also instructs personnel directors to carefully inform potential retirees about *all* benefit plans during a personal interview. "Adherence to the above guidelines is consistent with Corporation policy as outlined in the Salaried Policy and Procedure Manual." (*Id.* at 6.) Fuller attached a checklist of items to be covered during exit interviews:

> The following items must be covered as a minimum requirement for an adequate exit interview:
>
> \*    \*    \*    \*    \*    \*
>
> 7. Full explanation of status of employe benefit programs. Employe must be advised as to whether GM will provide coverage and whether employe must make contributions.
>
> \*    \*    \*    \*    \*    \*
>
> b. Hospital, Surgical, Medical and Drug Expense Benefits—Basic and Supplemental. Important for employe to know coverage and contribution, if any.
>
> \*    \*    \*    \*    \*    \*

Divisions having exit interview forms should review them to insure that the above areas are adequately covered. It is suggested that those divisions not having exit interview forms prepare a suitable form. Consistency and completeness is essential to a proper exit interview.

Fuller attached a similar checklist to an updated version of his letter in 1979. (Pl.Ex. 410.) Richard O'Brien, Vice President of Corporate Personnel, confirmed that company policy required an exit interview for early retirees, and a discussion of health care ben-

efits during that interview. (Tr. VIII(B) at 38.)

Special early retirements continued to be used throughout the 1970's, although most were taken between 1974 and 1976. In 1980 the Profit Improvement Program was announced. (*See* Def.Ex. 618, letter from Chairman T.A. Murphy addressed to General Managers of Divisions, et al.) The goals of the Profit Improvement Program "were to significantly improve our profit position, to reduce our cost substantially.... And to reduce our employment levels as well." (Tr. VIII(A) at 40, O'Brien.) [9] The Corporation hoped to reduce salaried employment, through layoffs and special retirement programs, by ten percent. (*Id.* at 40–41.) The Chairman's letter refers to Stephen Fuller's letter of August 17, 1979 for the administrative guidelines needed to implement reductions in the salaried workforce. (*See* above, Pl.Ex. 410.)

In the midst of a major corporate reorganization [10] in the early 1980's, GM initiated the North American Automotive Organization (NAAO) Placement and Separation Incentive Program. Chairman Roger B. Smith discussed management of human resources in light of the new organizational structure in a memorandum to General Mangers of Divisions, General Operating Officers, Group Executives, Staff Executives, and Heads of Staff Sections dated July 18, 1984. (Def.Ex. 622.) "The Placement and Separation Incentive Program provides for a specified period through December 31, 1984 during which time employes to be displaced will be identified and offered placement elsewhere or separation with certain incentives." (*Id.* at 1.) The Program allowed employees as young as 53 to be placed on layoff status for two years followed by a form of early retirement. The memorandum does not mention health care in the context of early retirement.

On September 13, 1984, Warren Sherman, Director of the Employe Benefit Plans Administration Section, issued a detailed letter containing administrative procedures for im-

---

**9.** The Morris Memorandum (Pl.Ex. 420) was issued in conjunction with this program. (*See* Section VI(A) below.)

**10.** Reorganization of the North American Automotive Organization (NAAO) led to the creation of the Buick–Oldsmobile–Cadillac (BOC) and Chevrolet–Pontiac–Canada (CPC) Groups within the Corporation.

plementing the Placement and Separation Incentive Program. (Def.Ex. 624.) The letter was sent to all divisional comptrollers and personnel directors. (Tr. XIII(A) at 7–8.) It states that, "Upon retirement, all Health Care coverages will be continued at Corporation expense." Sherman explained the meaning of this sentence as follows:

> That upon retirement the corporation would continue to provide at full cost to the corporation the insurance coverages for health care for these retirees. They had been paying the full cost of the insurance while they were active employees, and upon retirement, the corporation would continue to pay the full cost of their health insurance.

(Tr. XIII(A) at 10.) He also stated that "full cost" refers to the "full premium or subscription charge." He explained that the term "premium" is used by commercial insurance companies; but Blue Cross & Blue Shield uses the term "subscription charge." As a consequence the Corporation tried to avoid either term. (*Id.*)

> In other words, we—the way we provided our health insurance was through a different group of carriers, and they used different terminology, and what we have always meant is that the corporation would provide the full cost of insurance, and so when we used the term "full cost," we were talking about the full cost of the insurance and whether that was insurance that was provided by Metropolitan or insurance that was provided by Blue Cross and Blue Shield. It—it did not mean that we were providing the full cost of reimbursing medical expenses.

(*Id.* at 12.) On cross-examination, Sherman was asked and answered the following:

> Q. I want to take your concept of full cost and ask you this question. There was never anything sent to the employees that described to them how the full cost was computed, was there?
>
> A. An individual employee would not receive such a computation sheet.

(*Id.* at 33.) Sherman's letter also states that, "Health Care coverage will be continued during layoff and retirement according to existing provisions."

In 1985, GM implemented the Employment Security Program. That program allowed operating units to seek corporate authorization to reduce their salaried workforces through special early retirement offers directed exclusively to their employees. (*See* Def.Ex. 625 through 659.) A report to the Executive Committee of the Board of Directors concerning a request by the Chevrolet–Pontiac–Canada Group to use early retirement incentives includes the following comment:

> Presently, the Salaried Layoff Policy is the only mechanism available for reducing headcount. Unfortunately, the policy does not give us the flexibility to lay off longer service employes whose skills, both technical and managerial, may be obsolete and/or do not fit the new strategic direction and culture being established at C–P–C, which are vital to our success. In fact, quite the opposite may be true and we would be forced to part with our more technically skilled, higher potential employes, just the ones we need to close the product gap on our competitors.

(Def.Ex. 631 at 1.)

Warren Sherman mentions health care in at least two letters he addressed to officials of divisions approved for special separation programs. (Def.Exs. 666 and 667.) Sherman states that, "Retirement benefits, insurance continuance and Savings–Stock Purchase Program treatment generally will be accorded these employes as would be under existing provisions for such retirements." He also states that, "All basic Health Care coverages (Hospital, Surgical, Medical, Prescription Drug, Dental, Vision and Substance Abuse) will be continued at Corporation expense upon retirement according to existing provisions."

Due in part to the large volume of requests from various divisions for early retirement programs, GM adopted the Corporate–Wide Special Separation Program in August of 1986. (Def.Ex. 662.) As with some of the Employment Security Programs, the plan utilized early retirement offers for selected employees age 53 and over, and "separation incentives" for those under 53. (*See* Def.Ex.

661 at 1.) One goal of the Corporate–Wide Special Separation Program was to reduce the number of salaried employees through early retirement by 4,590. (*Id.*) The Program relied on forms of early retirement (Mutually Satisfactory and Special Retirement) already in existence, with one modification: Pension benefit reductions for outside earnings were eliminated. (*Id.* at 2.)

Following approval of the Corporate–Wide Special Separation Program, William P. Mac-Kinnon, Vice President for Personnel Administration and Development Staff (PAD), issued a letter to all Personnel Directors providing "information concerning the program's intent, content and application from an administrative standpoint." (Def.Ex. 664, cover letter.) As with previous retirement programs, MacKinnon emphasized the need for agreement of both the Corporation and the employee evidenced by a signed writing. (*Id.* at 5.) MacKinnon warns that, "The process of making [retirement] offers by line supervisors will require great tact and sensitivity, and the Executive Committee has asked the Personnel Function to take a leadership role in preparing such supervisors for this crucial sensitive role." (*Id.* at 9.) Finally, the letter attaches several sample "long-form" statements of acceptance.

Warren Sherman also prepared an administrative procedures document for the Corporate–Wide Special Separation Program in 1986. (Tr. XIII(A) at 13–14; Def.Ex. 668.) As with the earlier programs, Sherman did not believe the Special Separation Program amended the health care plan.[11] The administrative procedures document includes the following:

All basic Health Care coverages (Hospital, Surgical, Medical, Prescription Drug, Dental, Vision and Substance Abuse) will be continued at Corporation expense upon retirement according to existing provisions.

Effective October 1, 1987, GM's Retirement Program for Salaried Employees was amended in order to comply with changes in federal tax law. (*See* Pl.Ex. 401; Tr. XIII(B)

at 35, Hodgin.) GM could no longer offer early retirement to selected employees within in a particular age group; all employees within that group had to be made the same offer. Thereafter, GM periodically amended the Retirement Program to include an early retirement option for employees within particular age groups for specified periods of time ("windows"). Retirees were still required to agree to early retirement and to sign a statement of acceptance. (Tr. XIII(B) at 37.)

## VI. SUMMARY OF EVIDENCE CONCERNING INFORMATION GIVEN TO EARLY RETIREES

Plaintiffs rely on numerous benefit summaries given to members of the plaintiff class, and oral statements made to them shortly before they decided to retire. This section summarizes the evidence concerning information on health care supplied to early retirees.

■ Plaintiffs' Exhibit 4 is a compendium of 64 documents describing benefits in retirement that were received by members of the sample group of 318 subclass (1) and (2) early retirees. (*See* Section IV, above.) Most are explanations of benefits clearly designed for distribution to potential retirees. Others are interview checklists or memoranda directed to personnel staff. A few are letters written to individual retirees by personnel representatives. Plaintiffs' Exhibit 2 summarizes the content of these documents, and includes a list of retirees from the representative group who received each item.

Before agreeing to the admission of Plaintiffs' Exhibit 2, GM argued that it summarizes inadmissible hearsay evidence. The exhibit includes excerpts from the documents contained in Exhibit 4, as well as a list of sample group retirees who allegedly received each document. The list of retirees is based in large part on out-of-court statements made by the retirees, and submitted to the court in the form of affidavits. The list also

---

11. Thelma Lauderbaugh, who worked with Sherman in preparing the administrative guidelines for early retirement programs in the 1980's, (Tr. XIII(A) at 52–64), also stated that she never intended to create any special health care program for early retirees when she worked on special separation programs. (Tr. XIII(A) at 67.)

relies on documents found in the retirees' personnel files, and on witness testimony.

I find that the information contained in Plaintiffs' Exhibit 2 is reliable. Although the out-of-court statements made by retirees indicating that they received these documents are technically hearsay, the circumstances provide adequate guarantees of trustworthiness for their admission. Not only were the statements made under oath, but the retirees were able to produce copies of the documents from their own files. Furthermore, in many cases admissible corroborating evidence is available to support their claims. For example, many of the documents retirees claim to have received were also found in the personnel files of randomly selected retirees. In other cases, testimony established that a particular document was regularly used during pre-retirement exit interviews.

Finally, the nature of a large class action requires that evidence concerning individual class members be consolidated and abbreviated where possible. Although plaintiffs could have produced any particular declarant with relative ease, there are limits to the amount of detailed information on individual class members that can or should be heard during a single trial. Twenty members of the plaintiff class did testify. Furthermore, GM withdrew its objection (provided the exhibit be used only to show receipt of the documents) after I proposed that plaintiff class be given an opportunity to call additional witnesses in support of the exhibit. (Tr. XVIII(A) at 40.)

The following summarizes the information contained in Plaintiffs' Exhibits 2 and 4, in addition to testimonial and other documentary evidence.

## A. *The Morris Memorandum*

Plaintiffs' Exhibit 4–11, entitled "Some Important Considerations in Making a Decision Regarding Special Early and Mutually Satisfactory Retirement," is an attachment to a letter prepared by George Morris, GM Vice President of Industrial Relations. (Pl.Ex. 420.) The letter is dated May 2, 1980 and is directed to General Managers, Personnel Directors and Staff Executives. In the letter, Morris discusses implementation of the Profit Improvement Program which included an early retirement component. Morris instructs those receiving the letter to reproduce the attachment locally and provide copies to prospective retirees.

The attachment includes two sections, "Monthly Retirement Income," and "Other Benefit Considerations." The first contains general information on pension benefits. The second begins with the following:

* Full basic health care coverages for the retiree and eligible dependents are continued for life at no cost to the retiree, including:
    — Hospital, surgical, medical, drugs
    — Dental
    — Vision (starting 10–1–80)
    — Hearing aid
* Major medical coverage is continued for a small monthly contribution.

The document also discusses life insurance benefits, the Savings–Stock Purchase Program, the Employe Stock Ownership Plan, and product discounts.

Twenty-nine sample group retirees from a wide range of facilities received this document, or a revised version of it. Nine of them testified at trial: Edmond Burnside, who retired from AC Delco on September 1, 1980; Carl A. Gabrielson, who retired from Central Office in Detroit on September 1, 1980; James T. Bruce, who retired from Detroit Diesel Allison on October 1, 1980; Leonard Moeller, who retired from the Fisher Body plant in Flint on April 1, 1982; John Lockwood, who retired from North American Vehicles Overseas (NAVO) on July 1, 1983; O. David Nelson, who retired from Delco–Remy in Olathe, Kansas on July 1, 1986; Margaret Greenan, who retired from the Central Office public relations department in Detroit on February 1, 1987; Brainard Kugler, who retired from Central Office in Detroit on June 1, 1987; and Roger E. Hunt, who retired from Truck and Bus—Pontiac on September 1, 1987.

Before he retired, Carl Gabrielson received a packet of information concerning early retirement at his Detroit office. It included both the attachment to the Morris memoran-

dum ("Some Important Considerations"), and a statement of acceptance of special early retirement ready for signature. (Tr. II(B) at 60.) Gabrielson testified that he discussed health care benefits in retirement with his supervisor after he received the packet. He was told that he would have health care for his lifetime at no cost. (Tr. II(B) at 61.) Nevertheless, Gabrielson admitted that he understood that the phrase "no cost" did not mean he would not have some out-of-pocket expenses. He knew that he would have to pay something for vision and dental care if he opted for services beyond the basics. (*Id.* at 74–75.)

James T. Bruce received both the Morris memorandum, (Pl.Ex. 420), and its attachment, (Pl.Ex. 4–11), in connection with his retirement. (Tr. VII(A) at 5, 7.) He believed the Morris Memorandum reflected an amendment to the health care program for early retirees. (*Id.* at 26.) He also knew that the program was not entirely free; and that he would have to make "minimal payments." (*Id.* at 15.)

Leonard Moeller took special early retirement from the Fisher Body plant in Flint, Michigan in 1982. At a meeting with a personnel representative before his decision to retire, he asked specifically about health care. He was told that he would have the same benefits for his lifetime as he had while an employee. (Tr. VII(A) at 41.) When he signed his statement of acceptance, he assumed the phrase "benefits applicable to me" contained in the statement referred to the whole benefits package, including health care. (*Id.* at 44.) According to Plaintiffs' Exhibit 2, Moeller also received "Some Important Considerations." However, he did not mention it during his trial testimony.

John Lockwood retired from the North American Vehicles Overseas (NAVO) division of GM in Detroit on July 1, 1983 at age 55. He received a copy of "Some Important Considerations," and signed his statement of acceptance afterwards. (Tr. XIV at 6, 9; Pl. Ex. 150(b).) At the time he received the document, he "considered [it] a concise summary of what GM had always promised all of its salaried retirees." (*Id.* at 10.) When questioned about whether anyone discussed the meaning of the statement in the document concerning health care, Lockwood stated: "I believe that I had known about this type of thing for a long time. This had always been General Motors' policy, and I believed that it was their intent to carry it out forever, . . . . I'm not sure that there was any particular discussion over it. It's quite self-explanatory." (*Id.* at 18.)

O. David Nelson received "Some Important Considerations" at the time of his retirement. Mr. Nelson was the plant manager at the Delco–Remy battery plant in Olathe, Kansas. Before his own retirement, his job required him to personally speak with approximately six potential early retirees concerning their benefits in retirement. (Tr. III(B) at 17.) Although he did not provide them with copies of "Some Important Considerations" (some of the interviews took place before the document was written), he did tell them "that the benefits that they then had would continue and that there would be basically no increase in the cost to them for their lifetime. . . ." *Id.* at 18.

Richard O'Brien, Vice President of Corporate Personnel, testified that the Morris Memorandum was issued in conjunction with the Profit Improvement Program which had the goal, among others, of reducing the number of employees by ten percent. (Tr. VIII(A) at 42.) O'Brien held numerous positions at the corporate level in the personnel and benefits areas over his long tenure with GM, and probably reviewed the Morris Memorandum before its release. (Tr. VIII(A) at 41.) He explained references to health care contained in the memorandum's attachment as follows:

[T]hat referred to the health care benefits for the retiree and—and eligible dependents, that it would be covered for their lifetime as opposed to being cut off at one point in time. For example, many companies cut off benefits at age 65 when Medicare kicked in. This is an indication that those benefits would be continued for their—for their lifetime.

(*Id.* at 43.)

["No cost"] referred to the fact that the corporation paid the premium for health care for the coverage in place. It didn't

mean that the employee had no costs because under most of our plans, for example, under the basic plan—basic health care, the employee did pay for office visits. The only payment the corporation made was if the employee was hospitalized, then we would pick up that cost. But we would pay the premium. There was no cost sharing by the employee, no premium sharing by the employee.

(*Id.* at 44.)

Charles Ryan, Secretary of the Employe Benefit Plans Committee from 1981 until his retirement in 1992, agreed with O'Brien's interpretation of the Morris Memorandum attachment. (Tr. V(B) at 62–63.) However, he conceded that the phrase "lifetime health care benefits at no cost to you" is ambiguous. (*Id.* at 63.)

Other members of the sample group who received the Morris Memorandum will be discussed below.

### B. *Central Office (Detroit and New York)*

Two early retirees from Central Office in Detroit, Margaret Greenan and Brainard Kugler, received revised versions of the Morris Memorandum. (Pl.Exs. 148(p) and 151.) Greenan, who retired on February 1, 1987, received hers from Gerald Samuelian, a supervisor at GM Central Office Personnel. (Tr. XII(B) at 6.) The information concerning health care benefits contained in the document is virtually identical to the original.

Brainard Kugler was a payroll administrator in Detroit Central Office before he took a mutually satisfactory retirement in 1987. He also received a revised version of the Morris Memorandum, (Pl.Ex. 151), from Linda Pechenik during a pre-retirement exit interview. (Tr. XVI(B) at 51.) Together, they went over each point. (*Id.* at 53.) (Pechenik denies that she used this document during exit interviews. Tr. XVII at 34.) Kugler made a point to ask Pechenik about health care, because "I wanted to make sure that I'd be covered the same ... when I was working, that I would be covered when I retired." (*Id.* at 56.) He was told that the health care program would be the same in retirement. (*Id.* at 61.)

Greenan also received a document dated November 12, 1986, apparently prepared especially for her, entitled "Financial Planning." (Pl.Ex. 4–61) Under the heading "Health Insurance" it states:

> Your health care benefits will not change upon retirement, except with the additional medicare coverage available at 65 years of age. It would be advisable to continue CMEIP Coverage. Retiree contributions would increase from $1.20 per month to $3.00 per month, for single coverage.

| Policy | Current | Retirement |
|---|---|---|
| 1) Basic Health Care | | |
| Policy | GM | GM |
| Covered | Margaret | Margaret |
| Premium | GM | GM |
| | assumes | assumes |
| Eligible | For life | For life |

Provides basic health care benefits.

At the time of Greenan and Kugler's retirements, Linda Pechenik worked in "the benefits area" at the General Motors Central Office. (Tr. XV(A) at 18.) In 1986 and 1987 she assisted her supervisor, Jerry Samuelian, with early retirement interviews. (*Id.* at 19.) According to Pechenik, once a list of employees to whom GM was willing to offer early retirement had been prepared, the employees were given a document entitled "General Motors Corporate–Wide North American Special Separation Program," and asked to sign a statement of acceptance. (*Id.* at 21; Def.Ex. 697.) The seven-page document includes descriptions of a wide range of benefits, including health care. It states, "All basic Health Care coverages (hospital, medical, prescription drug, dental, vision and substance abuse) will be continued at Corporation expense upon retirement." It also notes that "General Motors Corporation reserves the right to amend, change or terminate the Programs described." Greenan admitted that she had seen and studied this document before she retired, but only because she made a copy of it when it "passed over her desk." She denied that she was ever given a copy by Pechenik or anyone else in personnel. (Tr. XVII at 10, 22.)

Pechenik testified that during retirement interviews she was occasionally asked about "guarantees of any future [health care] programs." (Tr. XV(A) at 30.) She told em-

ployees that "[s]alaried workers would pretty much piggy-back off" the benefits received by hourly employees, and that these benefits were renegotiated every three years. "I would tell them very specifically I could only attest to what was currently in effect, that as the next contract was approved, benefits were subject to change." (*Id.*)

Pechenik denied that she ever used "Some Important Considerations" during the retirement interviews she conducted. (*Id.* at 33.) Finally, she stated that it was her practice to provide every retiree she counselled with a copy of "Your Benefits in Retirement." (*Id.* at 32.) Kugler claims that he did not receive the brochure "Your Benefits in Retirement" until after he retired. (*Id.* at 57.) (For a discussion of this booklet, see subsection W, below.)

Central Office retirees received a variety of other documents discussing health care. Joseph Fox, who retired on May 1, 1980, received "Your Benefit Plans in Retirement." (Pl.Ex. 4–16.) This one page document states, "Blue Cross/Blue Shield–Dental–Hearing Coverages[:] GM pays the premium for you and your covered dependents for your lifetime." Fox received a second, untitled one-page document. (Pl.Ex. 4–17.) Under the heading "Health Care Coverages," it states, "BC/BS will be continued at GM expense." It also notes that Fox is eligible to continue coverage under the Comprehensive Medical program, and that the dental plan will be continued at GM expense.

Six members of the representative group who retired from Central Office in Detroit received a two-page document entitled "Insurance and Medical Coverages After Retirement." (Pl.Ex. 4–8.) Under the major heading "Medical Insurance," and sub-heading "Blue Cross/Blue Shield and Prescription Drug Programs," it states, "Your basic coverages will be provided at Corporation expense for your lifetime...." All six retirees also received at least one other document described in this section.

Robert H. Bickmyer, who retired from Central Office on October 1, 1986, received a multi-page document entitled, "Draft of Special Separation Program," dated June 19, 1986. (Pl.Ex. 4–47.) Under the heading

"Health Care, Dental and Vision," it states that, "Upon retirement, all health care coverages will be continued." This document also includes the following disclaimer:

This summary presents general information only. Any reference to the payment of benefits is conditioned upon your eligibility to receive benefits. Each of the benefit programs has its own terms and conditions which in all respects controls the benefits provided.

Bickmyer also received a personalized one-page document describing layoff and retirement benefits. (Pl.Ex. 4–48.) The document indicates that GM will pay Blue Cross/Blue Shield "for lifetime" at "no cost to retiree." Last, Bickmyer received "Basic Benefit Increases after Retirement." (Pl.Ex. 4–10.) This one-page document indicates that medical insurance (Blue Cross/Blue Shield) will be "continued without cost to you." Frank Laurenzo and Rocco Ruggiero, both of whom retired from Central Office—New York (Overseas Operations) on March 1, 1982 and July 1, 1979, respectively, also received this document.

In addition, Laurenzo received a document entitled "Explanation of Benefits." It includes a chart describing his benefits in special early retirement. (Pl.Ex. 4–30.) The chart indicates that "GM pays full cost for lifetime" for Blue Cross/Blue Shield Medical Insurance once Laurenzo retires. The text of the document also states, "Your basic coverages [Blue Cross/Blue Shield and Prescription Drug] will be provided at Corporation expense for your lifetime".

Dario Z. Breata, who retired from Central Office—New York on September 1, 1979, received a similar document and chart. (Pl. Ex. 4–7.) As with Plaintiffs' Exhibit 4–30, it indicates that "GM pays full cost for Lifetime" for medical insurance. Three other New York Central Office 1979 retirees, including Rocco Ruggiero, also received this document. One of these individuals, William G. Cooney, received an even more abbreviated chart, (Pl.Ex. 4–9), indicating that GM pays for Blue Cross/Blue Shield during retirement.

**C. General Motors Assembly Division (GMAD)**

(1) *South Gate Assembly.* Two of the documents contained in Plaintiffs' Exhibit 4 were given to early retirees of the South Gate assembly plant in California. The first, entitled "Employees Laid Off Who Will Retire From Layoff," (Pl.Ex. 4–1), was received by two South Gate retirees from the sample group of 451—Clinton Burns, who retired April 1, 1974, and Donald Nesbit, who retired November 1, 1980.[12] (Pl.Ex. 2 at 1.) It is a one-page summary of benefits, indicating that basic health insurance will be paid by GM for the "lifetime" of the retiree. Clinton Burns received a second one page document. (Pl.Ex. 4–2.) It includes information on pension benefits, layoff payments, life insurance and health care, stating that, "Your basic health insurance is paid up for you and your spouse for the rest of both of your lives."

Additional evidence concerning what early retirees were told about health care at the South Gate plant was received through the testimony of Walter F. Huppenbauer. Huppenbauer worked in salaried personnel administration at South Gate for many years before his retirement in 1981. Beginning approximately in 1960, he assumed a supervisory position in salaried personnel administration for the plant. (Tr. II(A) at 5–7.) Huppenbauer began processing early retirements when they were first introduced in 1974. (*Id.* at 9.) He estimates that he conducted a hundred or more pre-retirement interviews during his tenure at the plant. (*Id.* at 10.) He consistently told potential retirees "that they were going to get their basic health insurance for the rest of their life free and that they could continue comprehensive for a modest fee. . . . [W]e told everybody that." (*Id.* at 15.) However, on cross-examination, Huppenbauer also stated that the health care benefits he described to early retirees were no different than those given to general retirees. In other words, early retirees, according to Huppenbauer, were not offered a special health care deal. (*Id.* at 30, 47–48.)

Huppenbauer also testified that Plaintiffs' Exhibit 4–2, received by Clinton Burns, was a form used for all early retirees during the first wave of early retirements in 1974. (*Id.* at 17.) Huppenbauer created the form in conjunction with staff from salaried payroll. In the normal course of business, the form would have been reviewed by the divisional office for GM Assembly. (*Id.* at 18.) Plaintiffs' Exhibit 4–1, according to Huppenbauer, was used for early retirees who were offered retirement during the second wave of special early retirements in 1979. (*Id.* at 23.)

GM submitted a 1982 document entitled "Your General Motors Status and Your GM Benefits in Connection with the Discontinuance of Operations at GM Assembly Division South Gate Plant." (Def.Ex. 732.) Other than the existence of the document, no evidence indicates that it was received by any potential retirees. It includes the same information on health care, and the same disclaimer as found in Defendant's Exhibit 731, discussed immediately below.

(2) *Fremont Assembly.* Armand Petrolina retired from the Fremont Assembly Plant in California effective April 1, 1986, after being placed on layoff when the plant closed in 1982. He received a brochure entitled "Your General Motors Status and Your GM Benefits In Connection With The Discontinuance of Operations at the GM Assembly Division Fremont Plant." (Pl.Ex. 4–42; Def.Ex. 731.) It states, "Health Care coverages are continued for you and your eligible dependents for your lifetime, with General Motors paying the full cost if you are receiving Salaried Retirement Program benefits." It also includes the following disclaimer:

This summary presents general information only. Certain provisions summarized herein are subject to approval by the Internal Revenue Service.

Any reference to the payment of benefits is conditioned upon your eligibility to receive benefits. Each of the benefit programs has its own terms and conditions which in all respects controls the benefits provided. The full details of your benefits

---

**12.** As an example of corroboration of the evidence contained in Plaintiffs' Exhibit 2, I note that although direct evidence that Burns received this exhibit is available only through his affidavit, a copy of the document was found in the personnel file of Nesbit.

are included in the language of the various programs. The benefit programs have been summarized in an employe booklet, "Your GM Benefits", and brochures entitled "The Renewed Commitment" and "The Continuing Commitment", previously distributed to you. Additional copies are available upon request.

(Def.Ex. 731 at 1.)

(3) *Van Nuys Assembly.* Eleven of the retirees from the representative group of 451 who worked at an assembly plant in Van Nuys, California received a document summarizing their retirement benefits.[13] (Pl.Ex. 4–3.) The form includes a space for entering the individual's monthly pension benefits, in addition to a list of other benefits available in retirement. It states: "Blue Cross or Kaiser—Employee covered at no cost to employee." Retirees who received this information took retirements effective between December 1, 1974 and September 1, 1982.

Plaintiff class supplemented the evidence on Van Nuys retirees through the testimony of Anne Glick. Glick worked in salaried personnel at the Van Nuys plant until 1980. Although she was not directly responsible for processing early retirements, she was asked by her supervisor to assist with pre-retirement interviews in 1979. (Tr. III(A) at 7.) She was instructed to hand retirees personalized versions of Exhibit 4–3 (same as Pl.Ex. 109(c)) and to "tell them that whatever was on this sheet is what they are entitled to in their retirement for the rest of their lives at no expense to them." (Tr. III(A) at 11.) Glick personally conducted only seven or eight retirement interviews. (*Id.* at 25.) Although she pointed out the statement concerning health care during these interviews, she admitted that none of the retirees asked any questions about it. (*Id.* at 26.)

M. Scott Pruyn retired from the Van Nuys plant the year before Anne Glick was asked to assist with early retirement interviews. He was the personnel director at the plant from 1969 until his disability leave in 1977. (Tr. III(A) at 45.) He testified that early retirements came in two waves, the first in

1974, the second in 1977. Both were associated with decreases in production at the plant. His subordinates conducted most of the retirement interviews; however, he personally spoke with two individuals. (*Id.* at 54.) He told retirees that they would continue to have the same health care program they had as employees as long as they lived, at no cost to them. (*Id.* at 56–57.) When asked how he knew this information to be true, the witness stated, "That was General Motors' policy.... I was told that was General Motors' policy from practically every personnel director that I worked for before I became one." (*Id.* at 57.)

(4) *Oklahoma City Assembly.* Finally, the personnel file of Lionel Brace, one of the randomly selected individuals who retired from an assembly plant in Oklahoma City on May 1, 1983, includes a handwritten document dated September 14, 1982. At the top of the three-page document the following appears: *"L. Brace*—Early Mut. Sat. Retirement Recap." (Pl.Ex. 4–34.) The document indicates that basic health insurance, dental and vision "continue for self + dependent for life," and that Comprehensive "may continue for life by paying premiums."

## D. *Chevrolet—Toledo*

Wayne R. Riedel worked for Chevrolet in Toledo for 39 years before his early retirement in 1980. He worked in the plant's personnel department as supervisor of benefits from 1974 until his retirement. (Tr. IV(A) at 35.) He spoke with many potential early retirees concerning their benefits in retirement in 1974 and 1979. He told them "that their hospital and medical insurance would be paid by the corporation in full, and if they should die first, the full benefit would pass on to their surviving spouse." (*Id.* at 42.) Furthermore, Riedel testified that many of the retirees he spoke with asked questions about health care benefits. (*Id.* at 46.) He understood the phrase "benefits applicable to me" in the statements of acceptance early retirees were required to sign to refer to pension as well as health care bene-

---

13. Not all of these individuals received an identical form. For example, the forms of five retirees refer to dental insurance, the others do not.

However, all forms include the same language concerning Blue Cross or Kaiser coverage.

fits. (*Id.* at 51.) However, Riedel did not believe early retirees had rights to health care benefits not shared by general retirees. He told all retirees the same thing about health care. (*Id.* at 58.) Moreover, he conceded on cross-examination that "paid in full" health care meant that premiums, not necessarily all costs, were paid in full. (*Id.* at 66.)

### E. Chevrolet–Pontiac–Canada Group (CPC)

In the 1980's, two members of the sample group who worked at Van Nuys Assembly, by then part of the Chevrolet–Pontiac–Canada Group, received brochures associated with the Corporate–Wide Special Separation Incentive Program. Ronald Conrow, who retired on September 1, 1987, received "General Motors Special Separation Incentive Program[:] Classified Below Age 53 with 30 or More Years of Credited Service." (Pl.Ex. 4–51.) The document is dated September 1986, and the title page includes this heading: "Chevrolet Pontiac Canada Group." The personnel file of Carl Brown, who retired April 1, 1986, contains "Your General Motors Status and your GM Benefits Placement and Separation Incentive Program for Bonus Eligible Employees Age 58 or Older at Date of Separation." (Pl.Ex. 4–52.) Both documents indicate that "all health care coverages will be continued" upon retirement.

GM presented a document similar to the one received by Conrow. (Def.Ex. 671.) The title page and much of the information is identical. It, however, includes two additional pages. One is a statement of acceptance. The other contains the same "terms and conditions" disclaimer found in Plaintiffs' Exhibit 4–47 (discussed above in Section VI(B)). GM provided no evidence, other than the document itself, that this version was ever received by a potential retiree.

Brown also received a brochure describing benefits in retirement of which plaintiffs produced only an excerpt. (Pl.Ex. 4–49.) The excerpt is entitled "Section 5—When You Retire," and states, "Upon retirement, under the Mutually Satisfactory provision, all health care coverages will be continued, at corporation expense." A larger portion of the same document, although still incomplete,

appears in the personnel file of James D. Baker who retired from the Tonawanda Engine Plant in Buffalo, New York on April 1, 1987.

The personnel file of Sam D. Emerick, who retired from a Pontiac facility in Jacksonville on January 1, 1987, includes several versions of a brochure discussing the "Special Separation Program." (Pl.Ex. 4–39.) The documents are dated October 1985 and were issued by CPC. They include the standard "terms and conditions" disclaimer found in many documents from this time period. Each also states that, "Upon retirement all health care coverages will be continued."; some add "at Corporation expense."

Seven other members of the sample group received a variation of this document, dated September 1986, designed for the 55 to 59 age category. (Pl.Ex. 4–40.) They retired between December 1, 1986 and January 1, 1988 from a variety of facilities and divisions. The documents include the same information on health care and the same "terms and conditions" disclaimer.

### F. Delco and AC Spark Plug

Francis Doonan, who worked at Delco Electronics in Milwaukee and retired on August 1, 1977, received two documents describing health care in retirement. The first, is a one-page summary of various benefits available to retirees, entitled "General Data Concerning Retirements." (Pl.Ex. 4–5.) The document begins with a discussion of Blue Cross/Blue Shield. It states, "The Retiree and/or his spouse or eligible dependents are provided with Blue Cross/Blue Shield and Prescription Drug Program coverages without cost for their lifetime. This coverage is the same as for the active employe." As to CMEP, "The Retiree, his spouse, and eligible dependents can be insured for Comprehensive Insurance coverage for their lifetime." Doonan also received a letter from J.E. O'Loughlan, a supervisor in Benefit Plans Administration. (Pl.Ex. 4–6.) The letter, dated August 4, 1977, informs Doonan that he has been approved for special early retirement. It also states that, "Upon retirement free Blue Cross—Blue Shield coverage (including the Prescription Drug Program) and

the new retiree Dental Program will be provided for you and your spouse for your lifetimes. You and your spouse will also be covered under the Comprehensive Medical Insurance Program (Major Medical)."

Wilbur Oakley, who worked at a separate Delco facility, and retired effective July 1, 1975, received an extremely brief document entitled "Health Care Insurance." It states that, "Upon retirement all health care coverages will be continued at corporation expense." (Pl.Ex. 4–4.)

Thomas J. Morr, a defense witness, worked as a salaried personnel representative at Delco Electronics in Kokomo, Indiana from 1972 until 1978. (Tr. IX(B) at 39–41.) When special early retirement was first announced in 1974, management began the process by identifying those to whom they would offer special early retirement. Those individuals were then contacted and urged to schedule a meeting with Morr. (Tr. X(A) at 5.) Morr personally interviewed between 150 and 200 potential early retirees in 1974 in half-hour sessions. (Id. at 6.) He developed a checklist which he used during the interviews. The list covered the estimate of monthly pension benefits, taxes, surviving spouse provisions, savings stock purchase program, life insurance and health care. (Id. at 7.) He told retirees "that the health care plan that they currently were participating in would be continued when they retire, the—the same plan." Furthermore, he does not recall many questions from retirees concerning health care. "It seemed to be—to be a relatively nominal issue once the—the employee understood that—that following retirement, that he or she would—would have the same plan available." (Id. at 9.) The only document given to prospective retirees was an estimate of monthly pension benefits. (Id. at 11.) Discussion of health care matters took only a minute or less of the half-hour interview. (Id. at 12.) At the end of the interview, those who were interested in early retirement were instructed to schedule a second appointment with Morr. Retirees were asked to sign a statement of acceptance at the second interview. (Id. at 13.)

Five members of the sample group (Edmond Burnside, Geraldine Dombrowski, Billie J. Gates, George Hamilton and John Sheppke) who worked at AC Delco facilities in Atlanta, Detroit, Memphis, LaMiranda and Seattle, received two documents that mention health care. All of these individuals retired in 1980. The first is entitled "Retirement Benefits" and includes space for personalized information on various benefits. (Pl.Ex. 4–12.) On the fifth page, under the heading "Health Care Insurance," the document indicates that coverage for basic hospital, surgical-medical and prescription drug "after retirement will be continued at no cost to retiree." The final page of the document, however, includes this disclaimer: "While the information contained in this booklet is believed to be correct, it must be understood that provisions of the related policy or benefit plan shall govern in the event the information proves to be in conflict therewith."

This same group of AC Delco retirees also received a form entitled "Salaried Retirement." (Pl.Ex. 4–13.) On page two, under the heading "Blue Cross–Blue Shield Program or other local Plan Coverage", this appears: "Note: coverage after retirement will be continued at no cost to employe."

Edmond Burnside, Geraldine Dombrowski, and John Scheppke also received the Morris Memorandum.

One member of the AC Delco group, Edmond F. Burnside, who worked at the Atlanta facility, testified at trial. Burnside testified concerning several meetings he had with his regional sales manager, Mr. Schwerzel. Schwerzel stressed the advantages of free health care benefits in retirement. "This was the big benefit that he preached and preached and preached down here, and I was very insistent on it." (Tr. II(A), p. 54.)

GM submitted an August 1983 document entitled "Your General Motors Status and Your GM Benefits in Connection with the Discontinuance of Certain AC–Delco Operations if You are a Salaried Employe." (Def.Ex. 734.) As with several other documents submitted by GM, no evidence indicates that this document was actually distributed to any early retirees. The document includes a disclaimer similar to the one in Defendant's Exhibit 731, discussed in Section

VI(C)(2) above. The retirement section states that "Health Care coverages are continued for you and your eligible dependents for your lifetime, with General Motors paying the full cost...."

Two retirees from AC Spark Plug in Flint received a memorandum from Hazel M. Hanson concerning "Retirement Information." (Pl.Ex. 4–35.) Charles Meyers retired April 1, 1985; Robert Forst retired January 1, 1987. The document begins by stating, "This information is to help answer questions asked by prospective retirees." Under the heading "Basic Hospital, Surgical, Medical and Prescription Drug Expense Coverage," it states, "GM pays for the full cost of coverage for the retiree (other than deferred retirements) and for his eligible dependents...."

### G. *Detroit Diesel Allison Division*

Raymond Lucid, who retired from Detroit Diesel Allison on October 1, 1980, received a two-page document entitled, "Retirement Information Sheet." (Pl.Ex. 4–18.) It contains the following under the heading "Insurance Coverages":

> Your company-paid medical insurance coverages remain the same after retirement that you have as an active employee. Blue Cross/Blue Shield, dental, vision and hearing aid coverages. Also, you continue your Comprehensive Medical Expense Insurance (the major medical thru Connecticut General) at a cost to you as follows: [list of premiums]

The document also states that, "Benefits under the Retirement Program and company-paid medical insurance coverages continue for lifetime of the spouse, regardless of remarriage."

The personnel files of three Detroit Allison early retirees, Mary G. Franklin (retired January 1, 1987), Ernest Rasmussen (retired June 1, 1987) and Bartlett Cady (retired June 1, 1981), contain a document entitled "Minutes of Retirement Interview." (Pl.Ex. 4–28.) The document is a form designed for check-off of subjects covered. It also includes space for some personalized information, and for the retiree and GM representative to sign and date the form. It indicates that hospital/medical, prescription drug, dental, vision and hearing aid coverages will be provided in retirement "at no cost to retiree." Ronald Lund, who took special early retirement from Detroit Diesel Allison in 1987, also received this document. He stated that a representative from personnel discussed benefits with him, and used this form during the interview. (Tr. IV(B) at 11.) Lund asked the representative about health care. "[S]he responded that definitely we would have the complete program as it stood on that date for as long as we lived." (Tr. IV(B) at 12.)

Mary Franklin also received a one-page document from the Regional Personnel Administration. (Pl.Ex. 4–59.) It includes the following comment on health care coverages: "You will retain this coverage for life." Dental coverage "will continue."

### H. *Fisher Body Division*

Three early retirees from Fisher plants in Flint, Michigan, who retired in 1980, 1983 and 1987, received a one-page document describing special early retirement benefits. (Pl.Ex. 4–19.) The document states that, "Blue Cross/Blue Shield and dental expense are paid for by corporation for life."

Glyn W. Sadler, who testified at trial, took special early retirement from Fisher–Flint in 1980. He spoke with a supervisor concerning early retirement benefits, and specifically asked about health care because of his wife's severe problems with allergies and asthma. (Tr. III(B) at 60.) In response, he was told "I'd have the same coverage at no cost for me and my wife the rest of my life." (*Id.* at 63.) Furthermore, he was not told benefits could decrease. Indeed, he was told they were likely to improve. (*Id.* at 64.) Finally, he was sent home to discuss retirement with his wife, and to reassure her that her medical bills would be paid. (*Id.* at 65.)

John Abrinko, one of the randomly selected early retirees, retired from the Fisher Body Division in Detroit on March 1, 1982. On March 4, 1982 he received a letter from salaried personnel for the Division. (Pl.Ex. 4–31.) The letter includes the following paragraph:

Your Blue Cross/Blue Shield and Dental Expense coverages will be continued without cost to you as the Corporation will pay the full cost of this protection subsequent to your retirement. If you predecease your spouse, he/she may continue this insurance without cost under the General Motors Group.

Perry Sanderson was a salaried personnel representative at the Fisher Body Plant in Pontiac, Michigan from 1969 until it closed in 1982. He then transferred to the BOC plant in Lake Orion, Michigan and became a salaried benefits, and later personnel, representative until 1990. Sanderson processed salaried retirements at Fisher Body. (Tr. XIII(B) at 51.) Once special early retirements were introduced, "The process involved the departments contacting their employees that might qualify for a special early retirement, and giving a basic outline of what that involved, and asking the employees if they were interested in that special early retirement. If the employees expressed an interest, very often they would come to my office in salaried personnel and ask me for more details about retirements." (*Id.* at 52.) He only discussed health care if the employee asked a question, which was rare. (*Id.* at 53, 56.)

If they asked a question about—it was very rare that an employee would ask about—they had—seemed to have a concern about whether or not their health insurance might stop or be changed at the time of retirement. If—if that concern was expressed to me, I would ensure that them that their—their health insurance would not be changed at the time of retirement that it would continue. But that's the only type of discussion that I would have with them at that time about their basic health insurance.

(*Id.* at 56–57.) If the employee accepted retirement, he would notify his supervisor, sign a statement of acceptance, and then return to Sanderson's office to complete the paperwork. (*Id.* at 53–54.) At this time, the retiree was given a copy of "Your GM Benefits in Retirement." (*Id.* at 57.) However, no version of "Your Benefits in Retirement" was published before November of 1977. (*Id.* at 65.)

### I. *General Motors Institute*

Virginia Spencer, who retired from the General Motors Institute in 1980, received a memorandum addressed to the Payroll Department concerning her benefits. (Pl.Ex. 4–20.) It indicates that Blue Cross/Blue Shield, vision and dental expense coverages will be paid through retirement.

### J. *Harrison Radiator*

Frank Disinger, who retired from Harrison Radiator in 1980, received a document entitled "Information Regarding GM Benefits for Salaried Retirees." (Pl.Ex. 4–21.) It includes the following:

*HEALTH CARE COVERAGES*

Blue Cross—Blue Shield,—Prescription Drug Program and Hearing Aid Plan,— The Corporation continues to pay full contribution for the retiree, spouse and eligible dependents. . . .

Dental Care Plan—Corporation continues to pay full contribution for retiree, spouse and eligible dependents.

\*    \*    \*    \*    \*    \*

Comprehensive Medical Expense Insurance—coverage may be continued for the retiree, spouse and eligible dependents providing the retiree makes the required contributions. . . .

### K. *Hydramatic/Powertrain Division*

Several early retirees from the sample group took retirement from a Hydramatic Division plant in Ypsilanti, Michigan between 1980 and 1985. Five of them received a one-page document entitled "Estimated Retirement Benefits." (Pl.Ex. 4–22.) The document indicates that Blue Cross/Metro will be paid by GM. The personnel file of one of these individuals also contained a sheet entitled "Salaried Retirement Exit Interview." (Pl.Ex. 4–32.) The form states, "Blue Cross–Blue Shield—paid by G.M. for Retiree and Eligible Dependents throughout retirement."

As a salaried personnel representative at the Powertrain [14] plant in Warren, Michigan, Linda Denner processed early retirements between 1980 and 1990. (Tr. V(A) at 80.) She discussed health care during retirement interviews. (*Id.* at 82.) Once departmental managers selected employees to be made an early retirement offer, Denner gave pension estimates, without any additional information on other benefits, to potential retirees. If interested, employees were asked to sign a statement of acceptance and make an appointment with her. Employees were given "Your GM Benefits in Retirement" at this interview, and required to complete necessary paperwork. (Tr. V(B) at 9–11.) She briefly reviewed various sections of the booklet. Afterwards, she told employees "to read this from front to back and come back to me with any specific questions you might have." (*Id.* at 11.) However, she did not point out the disclaimer language in those booklets to retirees. (Tr. V(A) at 88.) She told retirees "that they would have health care coverages just like they have as a regular active employee. That nothing would be changing drastically." (Tr. V(B) at 15.) She processed approximately 200 retirements between 1980 and 1988. Only about ten percent of retirees had questions about health care; and of these most asked about dependent coverage. (*Id.* at 17–19.) Denner agreed that "all the benefits under the special early program . . . included health care." (*Id.* at 21.)

### L. *Packard Electric*

Five early retirees from the sample group who retired from various Packard Electric facilities received a personalized sheet of information concerning retirement benefits from Thomas C. Habel. (Pl.Ex. 4–24.) Habel was the supervisor of benefits for the Packard Division before his retirement, and had worked in salaried benefits for many years. (Tr. X(A) at 53.) Two of the retirements involved are from 1980; the other three are from 1986 and 1987. The documents state:

> During retirement, you and your eligible dependents will continue to have the same

health care program you enjoy today, with the following exception(s):

> No Exceptions [added by hand]

The only expense to you will continue to be your share of the Comprehensive Medical Expense Insurance Program which we have already arranged to have deducted from your Pension Check (If you are enrolled).

> In the event of your death, your surviving spouse would be enrolled in Her/His own name for the same hospitalization program.

Thomas J. Morr was Director of Salaried Personnel at Packard Electric Division from 1984 until 1988. (Tr. IX(B) at 33.) At trial, he was questioned about this document. He testified that he did not regard this language "as accurate because to say the only expense you'll continue to have would be comprehensive is not accurate because you have co-pays for things like prescription drugs, and you have deductibles and—and co-pays associated with the comprehensive, you have co-payments associated with psychological care, co-payments in dental, co-payments in—in vision and—and in hearing. So there are other expenses beyond what's stated here." (Tr. X(B) at 5–6.) Nevertheless, Morr conceded that it is reasonable to conclude that the form was used at Packard Electric for seven or eight years. (*Id.* at 8.)

### M. *Parts Division*

Two individuals from the Parts Division of General Motors received an extremely brief summary of benefits in the early 1980's. (Pl. Ex. 4–25.) It is entitled "Special Early—Mutually Satisfactory Retirement," and notes that "Hosp/Surg/Med/Drug Dental Vision (eff 10/1/80)" will be "Fully paid by GM."

### N. *Saginaw Steering Gear Division*

The personnel files of thirteen members of the representative group (including nine randomly selected individuals), who worked for the Saginaw Steering Gear Division, include a "Retirement Interview" form. (Pl.Ex. 4–26.) The individuals involved retired between 1980 and 1988. This one-page docu-

---

14. During a mid–1980's reorganization, Hydra-matic became part of the Powertrain Division.

ment indicates that Blue Cross, hearing aid, dental, and vision care will be "Provided by GM" for seven of the thirteen individuals. The remaining six files indicate that the benefits will be "Paid for Life by General Motors," or "Paid by GM for life."

### O. *Central Foundry Division*

Retirees from the Central Foundry Division received a variety of documents discussing retirement benefits. A "Salaried Retirement Interview Checklist," (Pl.Ex. 4–27), was found in the personnel files of four retirees from this Division. Meredith Robinson retired from the Modular Iron Foundry in Saginaw on September 1, 1986. Thomas Wiegandt retired from the Division on April 1, 1988 after taking special leave on September 1, 1987. Trafton Abbott, one of the randomly selected retirees, retired September 1, 1987. Thomas Cahape, also randomly selected, retired July 1, 1981. The document has several pages. Under the heading "Basic Hospital, Surgical, Medical and Prescription Drug Expense Coverage," it states, "GM pays for the full cost of coverage for the retiree (other than deferred retirements) and for his eligible dependents...." Gary Snyder, a salaried personnel administrator at the Saginaw Malleable Iron Plant (Central Foundry Division), testified that this form was used as a checklist during early retirement interviews from at least 1978 until late 1986 or early 1987. (Tr. V(B) at 67.) The Morris Memorandum, (Pl.Ex. 420), was also used during the 1980/81 time frame. (*Id.* at 70.)

Meredith Robinson also received a document describing "the Special Central Foundry Retirement Program as approved by the Corporation." (Pl.Ex. 4–53.) It describes the plan as follows:

> Under the plan, selected employes between ages 55 and 60 may be eligible to retire. Retirement must be initiated by GM and must be agreeable to the employe. The highlights of the plan include:
>
> * Unreduced pension benefits commensurate with the employes' years of service.
>
>    *     *     *     *     *     *
>
> * Continued health care coverage during retirement.

In addition to the interview checklist discussed above, Thomas Wiegandt's file includes a multi-page "Retirement Checklist." (Pl.Ex. 4–64.) Under the heading "Group Health Care," it states, "Basic hospital, Surgical, Medical, Prescription Drug[:] GM will pay the full cost of H.S.M.P. for retirees." This form also includes the following disclaimer:

> This summary presents general information only. Any reference to the payment of benefits is conditioned upon your eligibility to receive them. Each of the benefit programs has its own terms and conditions which in all respects control the benefits provided. The full details of your benefits are included in the language of the various programs.

Gary Snyder personally used this form during early retirement exit interviews. (Tr. V(B) at 72.) However, he conducted "relatively few" of these interviews himself. (*Id.* at 66.) Snyder also told employees that GM would continue to pay health care insurance premiums or their equivalent, not all costs associated with health care. (*Id.* at 5–6, 11–12.) In other words, he told employees that "the mere fact of their retirement did not alter their current health care, and we—that it just continued on, and GM would continue to pay that premium or that—that cost of the insurance going into retirement." (*Id.* at 18.) Snyder testified that retirees were also given "Your GM Benefits in Retirement" during exit interviews. (*Id.* at 19.)

Snyder also stated that a document entitled "Your General Motors Status and Your GM Benefits in Connection with the Discontinuance of Operations at Central Foundry Division Saginaw Nodular Iron Operations" (Def.Ex. 741) was given to Nodular Iron plant employees eligible for early retirement before that facility closed. (*Id.* at 23.) It contains a lengthy disclaimer which includes the following sentence: "Because General Motors reserves the right to amend or terminate its benefit plans and to amend its employment policies, your actual benefit entitlement may be affected by future plan amendments." (*See also* Def.Exs. 738 and 740.)

### P. *Terex Division*

Two members of the sample group who took early retirement from the Terex Division received two different versions of "Your General Motors Status and Your GM Benefits Following the Sale of the Terex Division." (Pl.Exs. 4–29 and 115(d); Def.Ex. 729.) Walter Lampert, a plaintiff class member who testified, received this document, (Pl.Ex. 115(d)), in the fall of 1980 shortly after he was told the Terex Division would be sold. (Tr. VI(A) at 39–40.) At page 21 of the document, this appears: "Health care coverages are continued for you and your eligible dependents for your lifetime with GM paying the full cost, if you are receiving salaried retirement program benefits...." Lampert understood this to mean that the "coverage then in existence would continue for the lifetime of myself and my spouse." (Tr. VI(A) at 41.) On the back of Lampert's personal copy of this brochure he took notes from a meeting held to discuss special early retirements with a group of Terex employees. According to his notes, the Director of Sales for North and South America made the following comment: "Look at your health benefits, continued for life and worth a fortune." (Pl.Ex. 115(d); Tr. VI(A) at 42–45.) This document, however, also includes the same "terms and conditions" disclaimer found in Plaintiffs' Exhibits 4–47, in addition to the following:

> The full details of your benefits are included in the language of the various programs. The benefit programs (except as otherwise may be modified in the following pages to apply to employes affected by the sale of TEREX) have been summarized in an employe booklet, "Your GM Benefits", previously distributed to you. An additional copy is available upon request.

Another Terex Division early retiree, Ed Plivelich, who retired effective November 1, 1984, received a similar document with the same title. (Pl.Ex. 4–29.) It includes the same language on health care. Plivelich's personnel file included a two-page document entitled "Estimated Retirement." (Pl.Ex. 4–50.) It states that health care, prescription drug, vision care, and dental will be "continued for life at no cost to employee." (Three

other individuals, who retired from a Chevrolet–Pontiac–Canada–Group plant in Parma, Ohio in 1986 and 1987, also received this form. (*See* Pl.Ex. 2 at 54.)

Lampert and a third employee, Norman O. Davis, received a one-page document entitled "'Memo Items' Retiree Benefits." (Pl.Ex. 4–33.) It indicates that Blue Cross/Blue Shield, Dental Plan, Vision Care, and the Hearing Aid Plan will be continued for life at no cost to the retiree.

### Q. *Buick Motor Division*

In the early 1980's several members of the representative group retired from the Buick Motor Division in Flint. Three of them received a one-page "Retirement Estimate." (Pl.Ex. 4–14.) The top of the form includes space for individualized pension benefits. The lower half discusses other benefits. Under the heading "Hospital–Surgical–Medical–Drug" it states, "Your present coverage will be continued on a Corporation paid basis."

Six Buick Motor Division retirees, including one who also received the "Retirement Estimate," received a one-page document entitled, "Additional Information." (Pl.Ex. 4–15.) The form includes the same information on health care coverages as the "Retirement Estimate."

Two individuals who retired a few years later (Carlin Belville in 1985, and Thomas Stephens in 1986) also received a form entitled, "Additional Information." (Pl.Ex. 4–58.) This form appears to be an updated version of the earlier document. Under the sub-heading of "Hospital–Medical–Surgical–Drug–Hearing Aid," it states, "Coverage continued on Corporation paid basis." The same sentence appears under the heading, "Dental Insurance and Vision Insurance." CMEP is "continued by pension deduction."

### R. *Buick–Oldsmobile–Cadillac Group (BOC)*

Several members of the representative group retired from Buick–Oldsmobile–Cadillac Group facilities in the late 1980's. A BOC memorandum from Gretchen K. Soutear, Director—Salaried Personnel, dated October 24, 1986 was received into evidence.

(Def.Ex. 670.) The document discusses administrative procedures for the Special Separation Program. Soutear instructs her readers to use information packets attached to her memorandum during separation discussions with employees. The attachments include six brochures directed to various categories of employees, all dated September 1986. The first discusses mutually satisfactory and normal retirements for employees age 60 to 64 and 65 to 69. The second concerns employees age 55 to 59 (those eligible for "Special Retirements"). It states, "Upon retirement, all health care coverages will be continued at Corporation expense." (Def.Ex. 670 at Bates stamp 005119.) The third attachment is directed to employees age 53 to 54. It includes two sections, one discussing benefits during leave, the other discussing benefits during retirement. The retirement section includes the same language on health care as above. The fourth and fifth documents concern employees ineligible for one of the retirement programs. The final document concerns employees below age 53 with thirty or more years of credited service. These employees were eligible for voluntary retirement under the terms of the general retirement program, and were offered a lump sum monetary payment as an incentive to take voluntary retirement. As with the other brochures, the document states, "Upon retirement, all health care coverages will be continued." These attachments also contain the "terms and conditions" disclaimer found in Plaintiffs' Exhibit 4–47 (discussed Section VI(B), above).

Four of the representative group, Jerome Nosal, who retired from the Fleetwood plant in Detroit on May 1, 1988, Edna Burns and Thomas Loftin, both of whom retired from a plant in Wentzville, Missouri in 1989 and 1988 respectively [15], and Charles Smith who retired from the Flint plant in 1986, all received some version of the attachments to Defendant's Exhibit 670. (Pl.Exs. 4–43, dated April 1986; 4–44, dated September 1986; and 4–46, dated April 1986). All three contain language concerning health care and a disclaimer virtually identical to that quoted above.

The personnel file of Daniel Spencer, who retired from a BOC assembly plant in Lordstown, Ohio in 1986, contains a multi-page document entitled, "Your General Motors Status and Your GM Benefits Placement and Separation Incentive Program for Bonus Eligible Employes Age 53–57 at Date of Separation." (Pl.Ex. 4–45.) It states that "all health care coverages will be continued"; but does not include the "terms and conditions" disclaimer.

Finally, N.P. Wuest, who retired from a BOC plant in Lansing, Michigan effective September 1, 1987, received "an information packet for those taking the Special Incentive Separation and retiring under the Early Voluntary provisions of the Salaried Retirement Program." (Pl.Ex. 4–57, Memorandum to Special Separation Program Retirees from Mike Sweeney dated January 28, 1987 with attachment.) The descriptive material includes the "terms and conditions" disclaimer and the following, "Upon retirement all health care coverages will be continued at Corporation expense."

Perry Sanderson worked as a salaried personnel representative at a BOC plant in Lake Orion, Michigan from 1982 until 1990. (Tr. XIII(B) at 51, 57.) He processed retirements at that facility during the Corporate–Wide Special Separation Program. Potential retirees were first approached by their department heads. If they had questions, they would come to him. (Id. at 58.) Interested employees would then sign a statement of acceptance and meet with him again to sign the final papers. Generally health care was not discussed. But there "seemed to be some concerns by some employees that at the time of retirement they would either lose their health insurance or it would be altered in some way by the fact of their retirement. And whenever I would get that question, I would assure them that their retirement

---

15. Some retirement dates are beyond the cut-off date for this class due to the fact that these employees agreed to retire before March 1, 1988. During the mid–1980's early retirements were offered to many employees below the age of 55. However, these employees were required to take layoff until they reached their 55th birthday. As a consequence many employees with late retirement dates actually left their jobs well before the class cut-off date.

would not have any effect on their health insurance." He did not tell them that their health care coverages would be the same for their lifetimes. (*Id.* at 59–60.) Most retirees received "Your Benefits in Retirement" at the time they signed their final papers. Sanderson processed between 100 and 150 salaried retirements between 1982 and 1987. (*Id.* at 62.) He believed that the special separation program did not change health care benefits. (*Id.* at 61.)

### S. *Electronic Data Systems (EDS)*

In a memorandum from J.L. Lewandowski and R.F. O'Brien, dated January 17, 1985, directed to "Personnel Directors—U.S. Operations," they discuss "Additional Questions and Answers Regarding Administration of Policies and Benefits Applicable to Eligible Employes Electing Not to Remain with EDS." (Pl.Ex. 4–37.) Under the heading "Insurance Coverages," the following question and answer appear:

Q. What specific insurance coverages will be provided during furlough and retirement?

A. The following insurance coverages will be provided at GM expense during furlough and retirement:

— Basic Group Life Insurance (2 × annual salary as of December 31, 1984);
— Health care (hospital, surgical, medical, dental, vision, prescription drugs, hearing aid) coverages will be provided during retirement. The same coverages, except dental, will be provided during furlough (dental will be reinstated upon retirement). If an employe chooses certain HMO's under the Informed Choice Plan, employe contributions may be required.

Beatrice Kirley and Orvil Summers, both of whom retired February 1, 1987, received this document. Kirley worked for the BOC (Buick–Oldsmobile–Cadillac) plant in Janesville, Ohio. Summers worked for the Truck and Bus Division in St. Louis.

Steven J. Horvath, an EDS eligible employee who testified at trial, also took early retirement at this time. He retired effective February 1, 1987 from the Electromotive Division in LaGrange, Illinois after a two-year furlough. He received several documents discussing benefits in conjunction with his decision to retire. One five-page document, co-signed by William P. MacKinnon, Vice President Personnel Administration and Development Staff (GM), and Kenneth G. Riedlinger, Senior Vice President (EDS), discusses options available to GM employees who do not want to transfer to EDS. (Pl.Ex. 111(b); Tr. V(A) at 39.) The information was effective as of January 1, 1985. The document discusses three categories of employees, those age 58 and older, those age 53 to 57, and those under age 53. Horvath was in the second category. The document offers first and second category employees Mutually Satisfactory retirement, or furlough followed by Mutually Satisfactory retirement. It includes the following paragraph:

In accordance with provisions of GM Group Life and Health Care Insurance Programs applicable to laid-off or retired employes, GM Basic Life Insurance (including Extra Accident and Survivor Income Benefit Insurance) and noncontributory health care coverage would be provided during the furlough period, and after retirement, except dental coverage would not be available while you are on furlough, and you could continue Optional Group Life Insurance, Dependent Group Life Insurance, Comprehensive Medical Expense Insurance Program and Sponsored Dependent Health Care Insurance coverages by making required contributions.

Horvath also received, and discussed in detail with a personnel representative, "Your General Motors Status and Your GM Benefits Placement and Separation Incentive Program for Bonus Eligible Employes Age 53–57 at Date of Separation." (Pl.Ex. 111(c); Tr. V(A) at 45.) The document is identical to Plaintiffs' Exhibit 4–45, discussed in Section V(F) above.

Horvath signed a Statement of Acceptance of Special Early Retirement, (Pl.Ex. 111(d)), at the end of his furlough. (Tr. V(A) at 49.) At that time he was given two pages of information on various benefits. (Pl.Ex. 111(e).) Under the heading "Hospitalization, Surgical–Medical Insurance Coverage," one

page states, "You'll continue the same hospital/medical-surgical benefits in retirement you had as an active employe even if it is an HMO. The cost, of course, is entirely paid for by the Corporation." Dental, vision and hearing aid are also continued during retirement and "paid for by the Corporation." Horvath understood this to mean that the premium would be paid throughout his retirement, and that the level of health care coverages would remain the same. (Tr. V(A) at 72.)

Horvath also received a copy of a memorandum addressed to "Personnel Directors— U.S. Operations from J.L. Lewandowski (General Director Personnel Administration) and R.F. O'Brien (General Director Employe Benefits)," dated January 17, 1985. (Tr. V(A) at 43.) It addresses "Additional Questions and Answers Regarding Administration of Policies and Benefits Applicable to Eligible Employes Electing Not to Remain with EDS." (Pl.Ex. 111(g).) Among the "insurance coverages" that "will be provided at GM expense during ... retirement" are "Health care (hospital, surgical, medical, dental, vision, prescription drug, hearing aid) coverages ..."

Finally, Horvath testified that he spoke with three separate administrators about health care in retirement. (Tr. V(A) at 46.) One told him that "I would maintain the health insurance and the life insurance at GM expense, and in—fact, his comments were along the line of, 'It's a real nice thing, and you don't have to worry about anything.'" (*Id.* at 47.)

**T. *Engineering***

The personnel files of three individuals from the sample group, who worked in engineering in Detroit, include a "Summary of Benefits." (Pl.Ex. 4–38.) Joseph Renvez retired December 1, 1986. Albert Abbo retired May 1, 1987. Frank Caito retired June 1, 1985. The form states, "BC/BS will be continued at GM expense (includes hearing aid program.)" The Dental Plan is also continued at GM expense. In addition, Renvez received a document directed to employees between the ages of 55 and 59. (Pl.Ex. 4–41.) It states:

You will be offered a Special Retirement effective no later than December 1, 1986. The following provisions would apply during the period of your retirement: ...

4. *Health Care, Dental and Vision*

Upon retirement, all health care coverages will be continued. You may continue Comprehensive Medical Expense Insurance Program (CMEIP) coverage by having the applicable contribution deducted from your retirement checks.

**U. *New Departure Hyatt Bearings Division***

Joseph Miller, who retired from the New Departure Hyatt Bearings Division on August 1, 1986, received a one-page document entitled "Retirement." (Pl.Ex. 4–54.) It states:

*HOSPITALIZATION AND SURGICAL/MEDICAL COVERAGE*

Under present provisions of the retirement program—Full basic health care coverages for yourself and eligible dependents are continued for life at no cost to you including:

— Hospital, Surgical, Medical and RX Drugs
— Dental
— Vision
— Hearing Aid

E.M. Chacko, who retired from New Departure Hyatt on December 1, 1987, received "Your General Motors Status and Your GM Benefits Following the Phase–Out of Commercial Bearings Operations at New Departure Hyatt Division Bristol Operations Sandusky Operations." (Pl.Ex. 4–60.) The document includes the following disclaimer:

The summary presents general information only regarding benefits and policies in effect on the date the summary is prepared. Any reference to the provision of coverages or payment of benefits is conditioned upon your eligibility for such coverages or benefits. Each of the benefit programs has its own terms and conditions which in all respects controls the coverages or benefits provided. The full details are included in the language of the various

programs. The summary in not intended to and does not create any contractual obligations. General Motors reserves the right to amend or terminate programs. In the section of the document addressed to employees age 60 or older, it states, "Upon retirement, all health care coverages will be continued." Similar information, also with a "terms and conditions disclaimer," can be found in Defendant's Exhibit 727, "Your General Motors Status and Your GM Benefits Following the Discontinuance of New Departure–Hyatt Bearings Division Clark Plant Operations." (*See also* Def.Ex. 737.)

### V. *Truck and Bus Group*

Five members of the sample group who worked for a Truck and Bus plant in St. Louis, and retired in 1987, received a one-page "Benefit Review." (Pl.Ex. 4–63.) Two of these individuals, Ellis W. Cook and Henry Knight testified at trial. The document states, "As a retiree, you will receive the same health care coverage that you now receive." The document also states in capital letters at the bottom: "For more detailed information, refer to your GM benefit handbook."

Henry Knight worked for the St. Louis plant for almost 35 years, and held numerous supervisory positions throughout the plant. (Tr. IV(A) at 4.) The plant closed on September 1, 1987. At a mass meeting two years before this event, Knight, along with other supervisors, was told of the planned closing. (*Id.* at 5.) In return for agreeing to stay with the plant until the end, the supervisors were promised they would be offered special early retirement at a later date. (*Id.*) Approximately six months before the plant closed, Knight attended two meetings designed to provide supervisors with information on special early retirement. Approximately a dozen future retirees attended each meeting. (*Id.* at 8–9.) At the first, Knight was given the "Benefit Review" discussed above, and told to examine it carefully. (Pl. Ex. 4–63 and 113(a); Tr. IV(A) at 10.) At the second meeting, Knight specifically asked

about health care benefits. He wanted to know if anything would be taken away. He was told to consider his past experience as an employee during which time he received "full medical benefits." The plant personnel director then read from a booklet, stating that, "your health benefits will be paid by General Motors for your lifetime at no cost to you." (*Id.* at 12.)

Ellis W. Cook attended a special early retirement meeting held by Gussie Green of the plant's personnel department, along with five or six other employees. (Tr. IV(B) at 34–35.) Several attendees were concerned about medical benefits, and asked Green about them. She told everyone "that we would receive our medical benefits the rest of our life at no cost to us." (*Id.* at 36.) Cook was given the same information on health care at a second meeting with a different personnel representative. (*Id.* at 38–39.)

Roger Hunt, a quality engineer for a Truck and Bus facility in Pontiac, Michigan, took early retirement in 1987. He received a version of the Morris Memorandum (Pl.Ex. 156(a)) from the staff head for his department before he signed his statement of acceptance. (Tr. XVI(B) at 26–27.)

Hunt also received a three-page document entitled, "Benefit Information for Classified Salary Retiree." (Pl.Ex. 156(c)). It states that hospitalization coverage will be "continued after retirement at no cost to retiree." The document was given to him by Norma Sparkman[16], "the divisional coordinator for the special early retirees," during a meeting attended by 15 to 25 early retirees. (Tr. XVI(B) at 29–30.) At the meeting, Sparkman read aloud to the group from the document. (*Id.* at 31.) Based on this document and other information given to Hunt, he understood "that there would be no changes in the health care benefits for the remainder of my lifetime at no cost to me." (*Id.* at 32.) Sparkman also gave him a copy of "Your Benefits in Retirement" at this meeting. (*Id.*; Def.Ex. 507.) And Hunt "studied it." (*Id.* at 40.)

---

**16.** Norma Sparkman worked directly under the supervision of Robert Hodgin, discussed below.

(Tr. XIII(B) at 20.)

Finally, Hunt received a brochure entitled "What you should know about your Benefits." (Pl.Ex. 156(d).) It was given to him "in a assembly-type meeting sometime after" he signed his statement of acceptance. (Tr. XVI(B) at 33.) The document addresses both general and early retirements. It includes several pages of information on various benefits. Under the heading "Benefit Program Coverages After Retirement," it states:

> With the exception of voluntary retirement with less than 85 points, all other types of retirement provide:
>
> — Full earn-out of GM's contributions under the savings-stock purchase program;
>
> — Health care coverages provided at GM's expense for lifetime;
>
> — Under Informed Choice Plan, you will continue to have the opportunity to make an annual election
>
> — Paid-up life insurance.

Six members of the sample group, who retired from various Truck and Bus facilities in 1986, 1987 and 1988, received a three-page document providing "Benefit Information" for retirees. (Pl.Ex. 4–55.) It states that hospitalization coverage (Blue Cross/Blue Shield) will be "continued after retirement at no cost to retiree." Vision care and dental coverage are also "available for retirees and eligible dependents at no cost to retiree."

Bobby Upchurch, who retired from Truck and Bus—Pontiac on November 1, 1987, received this document in addition to one directed to employees between the ages of 53 and 54, offering them a special leave of absence followed by special retirement. (Pl.Ex. 4–62.) Section II of that document is entitled "When You Retire." It states, "Upon retirement, all health care coverages will be continued." William Wessinger, who retired from the Proving Ground in Milford effective July 1, 1988, also received this document.

As an administrative engineer for Truck and Bus Operations in Pontiac, Michigan, Kenneth J. Titherage was responsible for personnel matters within the engineering department. (Tr. II(B) at 29–30.) Titherage processed retirements within his department

from 1974 until the date of his own early retirement in 1987. (Tr. II(B) at 30.) Hundreds of individuals retired during this time period. (*Id.* at 31.) Retirement information was conveyed to employees through a variety of means, including one-on-one conversations and group meetings conducted by representatives from divisional personnel. (*Id.* at 32.) Titherage stated that about half of potential retirees asked about health care in retirement. They were concerned about the possibility of increased health care costs. He told them that "health care would continue in retirement, as we had been accustomed to it during working days, and at no cost to the employee." (*Id.* at 33–34.)

Titherage personally spoke with two of the seven sample group retirees who received a three page document containing benefit information, (Pl.Ex. 4–55): Robert Pickett, who retired November 1, 1987; and Helen White, who retired January 1, 1987. (Tr. II(B) at 36.) Titherage also received essentially the same document from divisional personnel when he retired. (Tr. II(B) at 36; Pl.Ex. 170.) The document states that hospitalization coverage will be "continued after retirement at no cost to retiree." Pickett and White asked about health care, and were told by Titherage that they would receive the same type of health care and dental coverage in retirement as they had while working, at no cost to them. (*Id.* at 37.) Titherage relied on information he received from divisional personnel staff during human resources meetings. (*Id.* at 38.) He believes that the changes made to the health care program in 1988 are "in direct conflict with what I had been told personally and what I had told employees that had asked me that question." (*Id.* at 39.) However, Titherage also did not believe that early retirees received any special deal for health care. Rather, he understood that normal retirees would receive the same health care benefits; and he gave them the same information about health care given to early retirees. (*Id.* at 41, 46.)

Robert Hodgin was manager of employee benefits for Truck and Bus from 1982 until 1991. (Tr. XIII(A) at 77.) That position involved "the general administration of all

employee benefits, both hourly and salary, for the Truck and Bus Group." Kenneth Titherage attended at least one meeting conducted by Hodgin on September 5, 1986 to discuss implementation of the early retirement program with staff representatives. (Tr. XIII(B) at 19; Pl.Ex. 343.) Titherage and other staff representatives were instructed to act as a focal point of information for questions from employees on the early retirement program. (Tr. XIII(B) at 21; Pl. Ex. 343.)

Hodgin processed early retirements during his tenure at Truck and Bus, mostly in 1986/87. Potential early retirees were first given information on early retirement at mass meetings. Hodgin often accompanied staff heads to meetings with eligible employees under their supervision. "[W]e would go through and explain to them the outline of the program, what it consists of, who it affected, in general what the benefits were." Health care was discussed in a cursory fashion. Employees were told it was "available as a part of their retirement." (Tr. XIII(A) at 83.) Hodgin does not recall use of the term "lifetime" in connection with health care benefits. (Tr. XIII(B) at 8.) According to his recollection, "in the group meetings and then in the one-on-one meetings, the bulk of the discussion dealt with the monthly retirement benefit that the individual received, and health care was not a—an issue at all." (Id. at 9.) Moreover, when asked whether or not health care coverages could be changed, "[t]he response generally went along the vein that it could be changed, either improved or some, you know, items taken away." (Id.)

At the conclusion of the mass meetings, employees were provided with a pension estimate. Interested employees were then required to sign a statement of acceptance. (Tr. XIII(A) at 84.) Subsequently, some retirees met with Hodgin individually, others in groups. The meeting "would consist of sitting down with an employee and going through their various benefits that they would receive under the retirement program, what their eligibility was under the stock program or their options, what their options were under the health care program, and then process paperwork which they were re-quired to sign in order to institute the retirement." (Id. at 79.) When available, employees were given a copy of "Your GM Benefits in Retirement." (Id. at 81.) If, after the second meeting, an employee were to conclude that retirement was not for him, according to Hodgin, he would have been allowed to withdraw his statement of acceptance. (Tr. XIII(B) at 45.)

Hodgin believed that health care benefits were the same for both general and early retirees. (Id. at 82.) "Health care in retirement was no different at that time than health care as an active employee, and health care applied to retirements regardless of whether there was a window or an early voluntary or a regular retirement. There was no differentiation as to the type of health care. Health care was health care." (Tr. XIII(B) at 44.)

Finally, Hodgin testified that closing documents were prepared whenever Truck and Bus plants were closed or sold during this time period. (See, e.g., Def.Exs. 735 and 736, "Your General Motors Status and Your GM Benefits in Connection with the Discontinuance of Operations at Truck and Bus Group"; Tr. XIII(B) at 4.) Defendant's Exhibit 735, which is dated January 1985 and is approximately 40 pages long, is addressed to employees at the Dallas Truck Center, and the St. Louis, Pittsburgh and Boston Zone Offices. It describes transfer, layoff and retirement options available to employees whose jobs will be discontinued. The document includes the following disclaimer:

This summary presents general information only regarding benefits and policies in effect on the date the summary is prepared. Any reference to the provision of coverages or payment of benefits is conditioned upon your eligibility for such coverages or benefits. Each of the benefit programs has its own terms and conditions which in all respects controls the coverages or benefits provided. The full details are included in the language of the various programs. The summary is not intended to and does not create any contractual obligations. General Motors reserves the right to amend or terminate programs.

(Def.Ex. 735 at 1.) In the retirement section, the document also states: "Health Care coverages in effect at retirement are continued for you and your eligible dependents for your lifetime, with General Motors paying the full cost if you are receiving Salaried Retirement Program benefits...." (*Id.* at 23.) According to Hodgin, policy required all salaried employees at closing operations to receive documents similar to Defendant's Exhibits 735 and 736. (Tr. XIII(B) at 5.)

### W. *Summary Plan Descriptions*

GM argues that the documents described above are of no significance. Of all the information provided to early retirees, GM argues that only the summary plan descriptions (SPDs)—booklets entitled "Your GM Benefits" and "Your Benefits in Retirement"—which were distributed to all active and retired employees are appropriate sources for determining the terms of the plan. I also relied on these booklets for my holding that general retirees are not eligible for vested health care benefits. *See Sprague v. General Motors Corp.,* 768 F.Supp. 605 (E.D.Mich. 1991).

ERISA requires employers to provide each employee with a "summary plan description of any employee benefit plan." 29 U.S.C. § 1022(a)(1). The SPD must be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* Among other things, the SPD must include information on "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b).

In 1965 GM issued a brochure entitled "The General Motors Insurance Program." (Def.Ex. 500.) The document is directed to salaried employees and includes information on various insurance programs, including health care. It states that "GM will pay the full monthly premium or subscription charge for your basic Hospital, Surgical and Medical Expense coverages" if you retire. (*Id.* at 18.) On the last page, the following disclaimer appears:

General Motors believes wholeheartedly in this Insurance Program for GM men and women, and expects to continue the Program indefinitely. However, it reserves the right to modify, revoke, suspend, terminate, or change the Program, in whole or in part, at any time, except as limited by the provisions of the Group Contracts, or their supplements, and the provisions of any applicable Federal or state laws.

The 1968 and 1971 versions of the booklet, (Def.Exs. 502, 503), include essentially the same information.

In 1966 GM issued the first version of "Your GM Benefits." (Def.Ex. 501). It states that, "General Motors pays the full cost of your Blue Cross and Blue Shield or other equivalent coverages, and you pay the cost of the Supplementary Plan" if you retire. (*Id.* at 8.) The booklet refers the reader to other booklets, such as "The General Motors Insurance Program," for more detailed information. A "terms and conditions" disclaimer is included:

This booklet presents general information only and is designed to give you a broad picture of some of the advantages of working with General Motors—the added values that are so important to you and your family. Any reference to the payment of benefits is conditioned upon your eligibility to receive them. Each of these programs has its own terms and conditions which in all respects control the benefits provided.

(*Id.* at 3.)

In 1974 GM issued "Highlights of Your GM Benefits: A Handbook for Salaried Employes in the U.S." (Def.Ex. 504.) The following disclaimer appears in small print:

This booklet presents general information only and is designed to give you a broad picture of some of the added values of working with General Motors. Any reference to the payment of benefits is conditioned upon your eligibility to receive them. Each of these programs has its own terms and conditions which in all respects control the benefits provided.

(*Id.* at 3.) The section devoted to hospital and medical benefits does not mention bene-

fits in retirement. However, in a section devoted to retirement this appears: "Hospital–Medical Coverages: Your basic coverages will be provided at Corporation expense for your lifetime (except for voluntary retirement between ages 55 and 60 when combined years of age and credited service total less than 85.)" (*Id.* at 29.)

A revised version of "Your GM Benefits" was issued in 1977. (Pl.Ex. 27.) It includes the same disclaimer (more prominently displayed), and the same information on health care in retirement. GM also issued its first version of "Your Benefits in Retirement" in 1977. (Pl.Ex. 28.) It contains an abbreviated disclaimer in the front: "Each of the benefit plans has its own terms and conditions which in all respects control the eligibility and payment of benefits mentioned." (*Id.* at 3.) An additional disclaimer appears in the health care section: "GM health care coverages have been changed from time to time through the years and are subject to change in the future." This section also states that, "Your basic health care coverages will be provided at GM's Expense for your lifetime. . . ." (*Id.* at 11.)

Revised versions of both "Your GM Benefits" and "Your Benefits in Retirement" were issued in 1980. (Pl.Exs. 29 and 30.) They include the same disclaimers and the same information on health care.

Both were revised again in 1985. (Pl.Exs. 31 and 32.) These versions include a more explicit disclaimer: "General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet." (Pl.Exs. 31 at 1, 32 at 1.) The information on health care coverages in "Your GM Benefits" is unchanged. (Pl.Ex. 31 at 45.) The booklets were not revised again until after March 1, 1988.

## VII. *ANALYSIS*

I find that over a fourteen-year period, from 1974 to 1988, GM entered into contracts with its early retirees which vested in the retirees and their spouses certain health care benefits for their lifetimes at no cost to them. Put another way, GM contracted to provide early retirees in subclasses (1) and (2) with the same level of health care benefits for their lifetimes, without cost shifting, that they enjoyed as employees prior to retirement. These early retirement agreements are enforceable under ERISA as independent bilateral contracts, or as modifications of GM's health care benefit plan.

Having made that basic finding, I will restate the claims of the parties and detail my reasons. The early retirees [17] which form the plaintiff class have stated a claim for relief under ERISA, "where, as here, an employer allegedly agrees, apart from its regular plan, to provide a discrete group of employees with vested health care benefits in exchange for defined consideration." *Sprague v. General Motors Corp.,* 768 F.Supp. 605, 612 (E.D.Mich.1991). Welfare benefits, of which health insurance is one, 29 U.S.C. § 1002(1)(A), do not automatically vest. *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1297 (6th Cir.1991). However,

> the parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated. In construing such agreements, courts may draw inferences or make presumptions as this court has done in construing collective bargaining agreements providing welfare benefit plans.

*In re White Farm Equipment Co.,* 788 F.2d 1186, 1193 (6th Cir.1986); *accord, International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 301 (6th Cir.1991). Furthermore, the agreement to vest welfare benefits need not be explicit. *International Resources* at 301; *Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 95 (3rd Cir. 1992).

Plaintiff class argues that unreduced health care benefits are part of an early retirement offer made to them by GM, and that in exchange for this consideration they agreed to leave their jobs. The early retirees must prove their claims by a preponderance of the evidence. As juries are so often

---

**17.** The terms "early retirees," "plaintiffs," and "plaintiff class" are used interchangeably.

instructed, that requires a finding that their claims are more likely true than not true.

## A. *Did GM contract with the early retirees?*

Plaintiff class relies on the statements of acceptance that early retirees signed as evidence of a contract. GM maintains that the statements of acceptance are not contractual in nature, but are mere indicators of the retirees' intent to retire.

The statements of acceptance came in two basic forms—the short-form and long-form—with numerous minor variations. (*See* Pl.Ex. 3.) The short-form was first introduced in 1974, and used regularly until 1984. In conjunction with the Corporate–Wide Special Separation Program, the long-form statement of acceptance was introduced in 1984.

With minor variations, each of the statements of acceptance indicates that the early retiree has "reviewed the benefits applicable" to him or her and "accepts them." Following is an example of a typical short-form:

> Statement of Acceptance of Special Early Retirement
>
> Management has discussed with me the possibility of retiring under the Special Early Retirement provisions of the General Motors Retirement Program for Salaried Employes. I have evaluated the benefits applicable to me under the provisions of the Program and am agreeable to accepting Special Early Retirement effective _____. I understand that implementation of this retirement is subject to the necessary approvals.
>
> Signed: _____
> Date: _____

(Pl.Ex. 3 at 1–1.) A typical long-form statement of acceptance includes the following:

> *STATEMENT OF ACCEPTANCE OF SPECIAL RETIREMENT*
>
> Management has discussed with me the option of continuing my employment with General Motors or accepting an immediate special retirement under the Special Retirement provisions of the General Motors Retirement Program for Salaried Employes. I have evaluated the benefits applicable to me under the provisions of the General Motors Corporate Wide Special Separation Program and have decided to accept them. My retirement will be effective _____, 19__.
>
> I am satisfied with the terms of the special retirement offer and accept this offer voluntarily with full knowledge of its significance, including the fact that by accepting it I waive any claim in any way connected with my separation from employment with General Motors. I acknowledge that no prior representations, promises or agreements relating to my employment and retirement have been made by General Motors which are contrary to this Agreement and that the special retirement offer and my acceptance of the special retirement offer constitute the entire and only agreement between me and General Motors. I understand that I shall not be eligible for recall to work and shall have no further right to employment with General Motors Corporation or any of its subsidiaries. Implementation of this special retirement is subject to the necessary approvals.

(Pl.Ex. 3 at 10–1.) The long-form also includes a paragraph in which the retiree agrees, "[i]n consideration of the terms of the special retirement offer," to release GM from any claims associated with cessation of employment, including age discrimination and civil rights claims. The form includes space for retiree and witness signatures, and date.

Richard O'Brien, GM Vice President of Corporate Personnel, stated that the "primary purpose" of the statement of acceptance was "to assure that ... the employee did not make a decision that was coerced on him: ... that there was a mutual agreeable separation by the employee, mutually agreeable between the corporation and the employee." (Tr. VIII(B) at 38.) "[W]hen the employee mutually agrees to that, giving up the job, the employee is accepting the early retirement program and the other benefits in effect at that time." (*Id.* at 40.) Although retirement was more expensive than layoff, O'Brien acknowledged that GM received value in exchange for the employee's agreement to retire early. (*Id.* at 40.) Early retirement allowed the Corporation to reduce its

expenses through a reduction in the "overall head count." The statements of acceptance also protected the Corporation from age discrimination claims in both its short and long forms. (*Id.; see also*, Tr. XII(A) at 16, Lewandowski.) O'Brien considered early retirement a "win-win" situation "for the corporation and the employee." (*Id.* at 41; *see also*, Tr. XI(A) at 67, Mowers.)

In *Seward v. B.O.C. Div. of General Motors Corp.*, 805 F.Supp. 623 (N.D.Ill.1992), the contractual nature of GM's statement of acceptance was assumed, and GM successfully opposed an employee's attempt to rescind his acceptance. O'Brien agreed with this position, testifying that a statement of acceptance, once signed, could not be rescinded. (Tr. VIII(B) at 38.) [18]

In *Bair v. General Motors Corp.*, 895 F.2d 1094 (6th Cir.1990), a GM employee, signed a (short-form) statement of acceptance of early retirement before the "necessary approvals" had been secured. The Corporation then declined to extend an offer because Bair "was too valuable." Bair sued, "claiming that signing the Acceptance form created a binding agreement." *Id.* at 1096. The court disagreed. Although the form contained many of the indices of a contract, "[m]erely signing the form did not create a contract, since GM reserved the right to deny any particular employee participation." *Id.* at 1098. By implication, if Bair had obtained the "necessary approvals," a binding contract would have been formed.

In its post-trial brief GM virtually concedes that the statement of acceptance has contractual significance, and confines its argument to the meaning of its terms. (*See* GM Post–Trial Brief at 37–38.) According to GM, "the sole purpose of the statement was to protect GM against allegations that it coerced employees into retiring—and not to manifest some special contractual arrangement at variance with existing benefit plans." (*Id.*)

I find that both the long-form and short-form statements of acceptance of early retirement evidence a binding bilateral contract between GM and its early retirees. The statements are framed in clear contract language of offer, acceptance and agreement. By signing them, the salaried retirees in subclasses (1) and (2) agreed to retire and accept the applicable benefits. In exchange, they gave up future employment (and reemployment) with GM, the opportunity to earn future salary, benefits and pension accruals, and waived some of their legal rights to state claims against GM.

### B. What evidence may be relied on to interpret the contracts?

Having concluded that GM contracted with the plaintiff class, I must now determine the terms of those contracts. I first "look to basic contract law" for principles of construction. *In re White Farm Equipment Co.*, 788 F.2d 1186, 1191 (6th Cir.1986). "The legislative history demonstrates that Congress intended federal courts to develop federal common law in fashioning" relief under ERISA. *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 3097, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring); *see also, Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 794 F.2d 221, 234–35 (6th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986).

Although the statements of acceptance appear to be "a final expression of one or more terms of an agreement," they are not completely integrated contracts. Restatement (Second) of Contracts §§ 209(a), 210 (1981). "Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule." *Id.* at § 210(3). The statements of acceptance clearly do not contain all of the contract's terms. Reference is made to the

---

**18.** Some GM witnesses believed otherwise. For example, James Lewandowski, who was an Assistant Personnel Director in charge of salaried employees at the Oldsmobile Division in Lansing, Michigan, (Tr. XII(A) at 23), testified that "the individual had the opportunity to opt out of the retirement, up until the day they left," even though a statement of acceptance had been signed. (*Id.* at 35.)

"Special Early Retirement provisions of the General Motors Retirement Program" and "the benefits applicable to me under the provisions of the Program." Other evidence concerning the meaning of these phrases and contractual intent must be considered.

The early retirees rely on information provided to them at the time they considered early retirement to supply missing terms and interpret the meaning of "benefits applicable to me." GM argues that the statements of acceptance refer exclusively to the Retirement Program; and, in turn, that the plan documents for the Retirement Program refer exclusively to pension benefits with no mention of health care. Moreover, GM claims that the benefit summaries given to members of the plaintiff class as they considered retirement are of no legal consequence. Rather, the SPDs—"Your GM Benefits" and "Your Benefits in Retirement"—must control.

■ Generally, interpretation of an employee benefit plan must begin with the plan documentation ERISA requires employers to maintain—the official "written instrument" and/or the SPD. *See, e.g., Musto v. American General Corp.,* 861 F.2d 897, 900–01 (6th Cir.1988); 29 U.S.C. §§ 1022, 1102(a)(1). In this case, however, members of the plaintiff class were offered a special deal, the terms of which go beyond the general retirement plan. *Musto* specifically reserved this question:

> Whether, under ERISA, employees can ever obtain vested rights in welfare plan benefits on the strength of written representations outside the official plan document is a question we need not decide . . . .

*Id.* at 907.

In support of its contention that the (non-SPD) summaries provided to plaintiff class members at the time of their retirements cannot control, GM relies, in part, on *Flacche v. Sun Life Assur. Co.,* 958 F.2d 730, 735 (6th Cir.1992). In *Flacche,* the U.S. Court of Appeals for the Sixth Circuit reaffirmed and then limited an earlier opinion, *Edwards v. State Farm Mutual Auto Ins. Co.,* 851 F.2d 134 (6th Cir.1988), concerning SPDs. In *Edwards,* the court held that an SPD controls over conflicting provisions in a corresponding written plan.

"It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." *McKnight v. Southern Life and Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985). *See also Govoni v. Bricklayers, Masons & Plasterers,* 732 F.2d 250, 252 (1st Cir.1984) (reliance or prejudice from faulty plan summary is ground for relief); *Bower v. Bunker Hill Co.,* 725 F.2d 1221, 1224–25 (9th Cir.1984) (misleading summary plan description, combined with misleading management representations, preclude summary judgment in favor of employer); *Hoefel v. Atlas Tack Corp.,* 581 F.2d 1, 3 (1st Cir.1978) (enforcing summary of retirement plan) *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); *Genter v. Acme Scale and Supply Co.,* 776 F.2d 1180, 1185 (3d Cir.1985) (the summary plan description must not mislead, misinform or fail to inform participant and beneficiaries of the plan); *Hurd v. Hutnik,* 419 F.Supp. 630, 656–57 (D.N.J. 1976) (despite disclaimer, summary plan statement governs).

*Edwards,* 851 F.2d at 136. Edwards also received misleading annual reports and letters from his personnel manager.

> [T]he material misrepresentations [contained in the SPD] were aggravated by Hill's reassuring letters to Edwards verifying the summarized definition of "service time" as well as the assurances conveyed by the 1982–1983 reports of his credited service time in the "Annual Statements—U.S. Employee Retirement Plan" provided to him.

*Id.* at 136. And in a case cited by *Edwards,* the court looked to management representations and past practice, as well as the summary plan description, to determine whether or not health care benefits had vested. *Bower v. Bunker Hill Co.,* 725 F.2d 1221 (9th Cir.1984).

The plaintiff in *Flacche* relied on a "Summary of Benefits Certificate" that was mailed

to him after he retired. The court concluded that, unlike an SPD, the certificate could not trump ERISA-required plan documents. *Flacche* at 736. The facts of *Flacche*, however, are markedly different from those involved here. Shortly after Flacche's retirement, he was informed by letter that his pension would be $2,861 per month. When the payments arrived they were in the amount of $3,959 per month. Later that year he received a "Summary of Benefits Certificate," indicating that the figure would be increased to $4,846 per month. Two years later, the error was corrected, and Flacche's pension was reduced. In the meantime, in reliance on the higher figure, Flacche had retired from a second job. Flacche sued for breach of fiduciary duty and promissory estoppel.

■ The circumstances surrounding the certificate mailed to Flacche differ significantly from this case. The information given to plaintiff class members as they considered whether or not to give up their jobs was designed both to inform and to encourage acceptance of early retirement. For these reasons, GM supplied them with the information *before* they retired. Flacche did not receive his benefits summary until *after* he retired. Furthermore, GM's early retirees had every reason to believe they were being offered a special deal, apart from regular retirement. (*See, e.g.,* Tr. III(B) at 74, Sadler told "this is a new, special, one-time [deal] that superseded everything else"; Tr. IV(A) at 5, Knight told that if he remained at plant until closing he would be offered special early retirement.) Flacche apparently took an ordinary form of retirement involving no special incentives. Unlike plaintiff class, he did not have a contract claim.

GM also cites *Hicks v. Fleming Cos.,* 961 F.2d 537 (5th Cir.1992). Hicks claimed entitlement to disability benefits, even though, as he conceded, under the terms of the plan he was not eligible for them. He relied on a single document, which he received shortly before his accident, "Your 1988 Total Compensation Report," indicating that he was eligible for disability benefits. It "also con-

tained several disclaimers, warning that the information contained in the booklet was merely a summary, that benefit amounts were not final, and that its terms were subject to those in the various benefit plans themselves." *Id.* at 539. As with *Flacche,* the key difference between Hicks and members of the plaintiff class is the lack of offer and acceptance. Hicks was merely supplied with some misinformation. He did not agree to accept that information in exchange for a loss of employment rights and he did not rely on it, as GM's early retirees did rely on the information given to them.

GM contends, and I agree, that the SPDs cannot be ignored simply because they are regular plan documents. To do so would beg the question. If plaintiff class relied on, or reasonably should have relied on, the SPDs for the terms of their early retirement agreements, then the SPDs have significance. I find, however, that this did not occur in this case.

Several plaintiff class members testified that they did not consider "Your GM Benefits," because they did not believe it applied to them. (*See* Tr. II(B) at 71, Carl Gabrielson; Tr. IV(B) at 27, Ronald Lund; Tr. IV(B) at 53, Ellis Cook; Tr. VII(A) at 27, James Bruce.) The booklet was designed for distribution to active employees, presumably when hired and again when new versions were issued. Its distribution was not associated with any early retirement offer. As for "Your Benefits in Retirement," many early retirees did not receive it until after they retired, or just before they walked out the door. (*See* Tr. IV(A) at 20, Henry Knight; Tr. IV(A) at 68–69, Wayne Riedel; Tr. IV(B) at 49–57, Ellis Cook; Tr. VII(A) at 72, Leonard Moeller.)[19] And those members of the class who retired before November 1977, when the booklet was first published, obviously could not have received it before then. For these reasons, I find that members of the plaintiff class reasonably could and did conclude that the terms of their special early retirements were not controlled by either "Your GM Benefits" or "Your Benefits in Retirement."

---

**19.** Others may have received it earlier in the process. (*See* Tr. II(A), Edmond Burnside; Tr. IV(B) at 13, Ronald Lund; Tr. V(A) at 88 and V(B) at 16, Linda Denner.)

Furthermore, the disclaimers contained in these two publications were not in all cases clear. Many contain a "terms and conditions" disclaimer:

Any reference to the payment of benefits is conditioned upon your eligibility to receive them. Each of these programs has its own terms and conditions which in all respects control the benefits provided.

(*See* Def.Ex. 501, "Your GM Benefits" (1966); Def.Ex. 504, "Highlights of Your GM Benefits" (1974); Pl.Exs. 27 and 29, "Your GM Benefits" (1977 and 1980); Pl.Exs. 28 and 30, "Your Benefits in Retirement" (1977 and 1980), both also state that "health care coverages ... are subject to change in the future.") More explicit disclaimers did not appear until 1985: "General Motors reserves the right to amend, change or terminate the Plans and Programs described in this booklet." (*See* Pl.Exs. 31 and 32.)

In a case involving a similar "terms and conditions" disclaimer, the court concluded that "[t]o give effect to such a disclaimer would wholly undermine the rule that the statements of the summary plan description are binding." *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991). I agree that a "terms and conditions" disclaimer (also found in some of the benefit summaries on which plaintiffs rely) should have no force in the context of special early retirement offers.

The disclaimer that appears in the 1977 and 1980 versions of "Your Benefits in Retirement"—"GM health care coverages have been changed from time to time through the years and are subject to change in the future"—also lacks force. Members of the plaintiff class understood this to mean that positive, not negative, changes were possible. (*See, e.g.*, Tr. II(B) at 4–6, Edmond Burnside; Tr. VII(A) at 52–53, Leonard Moeller.) GM argues that changes to the health care program (both improvements and reductions in coverages) were a regular occurrence over the years. The evidence, however, demonstrates that changes were always communicated to employees as positive improvements. (*See, e.g.*, Pl.Ex. 46 (1973), "new and improved compensation, policies and benefit programs"; Pl.Ex. 48 (1976), "major improvements in benefit plans"; Pl.Ex. 49 (1976), "Improvements in GM Salaried Employe Compensation, Policy and Benefits"; Pl.Ex. 51 (1979), "1979 Benefits Improvements for General Motors Salaried Retirees and Eligible Survivors"; Pl.Ex. 57 (1982), "detailing changes and improvements in policies and benefit plans for U.S. salaried employes"; Pl.Ex. 58 (1985), "Benefits Improvements for General Motors Salaried Retirees and Eligible Survivors".) [20]

C. Douglas Eavenson, former Director of Health Care for the Corporation, believed that these disclaimers must be interpreted in the light of a history of positive program changes. In response to a question concerning possible conflict between his position that GM breached its promise to provide retirees with lifetime health care and the disclaimers found in "Your Benefits in Retirement," Eavenson stated:

I think that apparent conflict can be resolved if you look at and think about the culture that existed within General Motors over those years during which employees were told repeatedly that these coverages

---

**20.** GM also relies on a disclaimer found in a form used to process retirement pensions—the SRP–117. This form was in use from at least 1974 until it was replaced by a computerized version in 1983. The form is entitled, "General Motors Retirement Program for Salaried Employes[:] Authorization of Monthly Part A Benefits and Part B Supplementary Benefits." (*See, e.g.*, Def.Ex. 770(F).) The form was used to "set up" employees in the pension check payment system, and all retirees were required to sign it. (Tr. XIII(A) at 43, Warren Sherman.) The front of the form includes detailed information on the retiree and his or her pension benefits. Among other comments in small print on the reverse side, the following appears:

Subject to the provisions of the General Motors Salaried Insurance Program and the Comprehensive Medical Expense Insurance Plan for Retirees and Surviving Spouse, I may be eligible to continue ... Basic Medical Coverage for Self and Eligible Dependents....

The computerized version of the form is one-sided, without any of the information included on the reverse side of the original form. Given the full context of information supplied to plaintiff class members concerning their health care, this statement on the back of a single form designed to trigger payment of pension benefit is without significance.

would be continued for life, and so when there's an admonition that there may be modifications or changes, I think that—that reading has to do with the past experience that we've had of making some changes. Those changes were always improvements. There was not an admonition that—that this program can be drastically reduced or eliminated.

(Tr. I(A) at 60.) This history of emphasizing the positive is also reflected in a comment made by a member of GM legal staff at a meeting attended by Eavenson and various divisional personnel directors:

> GM is not in sound position to win the probable lawsuit filed by retirees. Program booklets and previous pre-retirement interviews have not stressed the possibility of "negative" program changes.

(Pl.Ex. 303 at 2.) Eavenson recalled that there was "particular concern with respect to individuals already retired, that they had—had retired with the understanding that their coverages would continue as they were without reduction and without them making payments for cause." (Tr. I(B) at 7.)

■ GM also argues that any oral statements made to plaintiff class members cannot be relied upon to modify an ERISA plan. ERISA requires that every employee benefit plan be "established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). Courts have stressed the importance, for both employer and employee, of the predictability provided by written plans. Citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999 (6th Cir.1993), the court in *Gordon v. Barnes Pumps, Inc.*, 999 F.2d 133, 137 (6th Cir.1993), went so far as to say: "It is well-established that the written terms of a plan may not be modified or superseded by oral assurances or other extrinsic evidence." However, *Boyer* at 1005 also noted:

> The written terms of the plan documents control and cannot be modified or superseded by the employer's oral undertakings. [*Musto*] at 910. However, if the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence. *See White Farm*, 788 F.2d at 1193.

*See also Smith v. ABS Industries, Inc.*, 890 F.2d 841 (6th Cir.1989) (court relied in part on oral statements to find health care benefits vested at retirement). Thus, if the terms of a particular plan are unclear, extrinsic evidence (including oral statements) may be considered.

In *Gordon, supra*, several terminated employees claimed a vested interest in a severance plan that was replaced by a less generous plan before they were terminated. The court rejected their claim, because no evidence demonstrated that the employer had agreed to contract away (or vest) severance benefits. *Id.* at 136. The opinion distinguished *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir.1991), a case involving reliance on oral statements:

> In *Armistead*, the company had a welfare plan that gave it the right to modify its provisions. The company plant closed down, and employees were given the opportunity to transfer. Numerous employees chose to retire because they were told by the company that the Plan provided favorable retirement benefits. Upon retirement, the company informed the employees that the Plan had been altered and the employees would not receive benefits. At that point, it was too late for the employees to obtain a transfer.

*Gordon* at 137. *Armistead* concluded that an estoppel claim *based on oral assurances* could be maintained. In rejecting the argument that oral statements may not be relied upon, the court stated:

> This reasoning applies primarily to cases involving pension plans and is much less cogent when welfare benefit plans are at issue. The reason is that pension benefits are typically paid out of funds to which both employers and employee contribute. Contributions and pay-outs are determined by actuarial assumptions reflected in the terms of the plan. If the effective terms of the plan may be altered by transactions between officers of the plan and individual plan participants or discrete groups of them, the rights and legitimate expecta-

tions of third parties to retirement income may be prejudiced.

This is not necessarily the case with insurance benefit plans. Typically the employer pays policy premiums out of its own assets, perhaps with a contribution from the employee. The actuarial soundness of a fund, which might be depleted if strict vesting and accrual requirements were not observed, is not an issue where a plan of this description is involved. We conclude therefore that in such a case, the purpose of Congress in enacting 29 U.S.C. § 1102(a) would not be frustrated by recourse to estoppel principles, which are generally applicable to all legal actions.

*Armistead* at 1300.

Although plaintiffs' estoppel claim is not currently before me, I observe that the facts of plaintiffs' case are more similar to *Armistead* than to *Gordon.* In *Gordon,* no voluntary event, such as early retirement, occurred to seal an alleged promise. Although the U.S. Court of Appeals for the Sixth Circuit has declined to adopt a *per se* rule to the effect that welfare benefits vest at retirement, it has held that benefits may vest at retirement if the parties so intend. *White Farm,* 788 F.2d at 1192–93; *Armistead* at 1297–98. Detrimental reliance was also a distinguishing factor in *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 949 (6th Cir. 1990) ("Plaintiffs have failed to show any detrimental reliance based on the defendant's failure to comply with section 1102(b), and, under these circumstances, we decline to impose the substantive remedy of prohibiting plan amendment in response to defendant's procedural violations").

Plaintiffs suggest that the *Edwards* principle (SPDs control over written plan) be extended and applied by analogy to this case. "[I]n the context of the early retirement agreements, it is the benefit explanations which are the primary source of information received by employees regarding their retiree health care benefits," not benefit booklets "generated outside the context of the early retirement agreements." (Plaintiffs' Post–Trial Reply Brief at 15–16.) ERISA "contemplates that the summary will be an employee's primary source of information re-

garding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907 (2d Cir.1990). Likewise, the benefit explanations provided early retirees at the time of their retirement were the primary source of information they received regarding employee benefits, and they were entitled to rely on them.

In summary, I find that in the context of special early retirement offers, class members could, and did, justifiably rely on information supplied to them, in both written and oral form, at the time of their retirements.

**C.  *Did the contracts include health care?***

Some evidence supports GM's claim that it did not *subjectively* intend to offer early retirees a special health care program. For example, James Lewandowski, who drafted the initial statements of acceptance, testified that they were designed to refer exclusively to the "Retirement Program," and "the only benefits applicable to individuals under the provisions of the Salaried Retirement Program are those income replacement or pension amounts that an individual would receive on a monthly basis." (Tr. XII(A) at 21.) However, subjective intent is not the proper test in a contract case.

■ Contractual intent is concerned with objective manifestations of intent, not with the subjective, hypothetical, unexpressed, or nonexistent intentions of the parties. "[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention. In cases of misunderstanding, there may be a contract in accordance with the meaning of one party if the other knows or has reason to know of the misunderstanding and the first party does not." Restatement (Second) of Contracts § 212, comment a (1981); *see also, id.* §§ 201 and 2; *In re Lane,* 742 F.2d 1311, 1316 (11th Cir. 1984) ("It is well-recognized in all areas of the law, that a *subjective* intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent"); *Lowrance v. Hacker,* 888 F.2d 49, 51 (7th Cir.1989) ("overriding goal of

contract interpretation is to give effect to the reasonable expectations of the parties"); *Empro Mfg. Co. v. Ball–Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir.1989) ("Contract law gives effect to the parties' wishes, but they must express these openly"); *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 873 (9th Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) ("Under the modern theory of contracts we look to objective, not subjective, criteria in ascertaining the intent of the parties").

■ In order to discern the objective intent of the parties in a benefit plan situation, a trier of fact may consider (1) the (subjective) intent of the employer, (2) the reasonable understanding of the beneficiaries, and (3) the past practice of the parties, among other evidence probative of the parties' contractual intent. *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 96 (3rd Cir. 1992). *See also* Restatement (Second) of Contracts § 212(1) (1981) ("The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances . . . .")

■ In this analysis, emphasis should be placed on the reasonable understanding of the beneficiaries. ERISA was designed to protect their interests. *See* 29 U.S.C. § 1001(a). Furthermore, the rule of *contra proferentem*, which was essentially adopted by the U.S. Court of Appeals for the Sixth Circuit in *Edwards, supra*, requires that benefit plan ambiguities be construed in the employees' favor. *Germany v. Operating Engineers Trust Fund*, 789 F.Supp. 1165, 1169 (D.D.C.1992); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); *Masella v. Blue Cross & Blue Shield, Inc.*, 936 F.2d 98, 107 (2d Cir. 1991); *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991); *Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 311–14 (7th Cir.1992). *Hansen* explains:

> In contracts of insurance generally, ambiguities are resolved against the drafter. *See, e.g., City of Rose City v. Nutmeg Ins. Co.*, 931 F.2d 13, 15 (5th Cir.1991). The same rule should apply here; the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter. Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.

*Hansen*, 940 F.2d at 982.

The reasoning behind the doctrine of *contra proferentem* is similar to the reasoning behind the ERISA provision requiring summary plan descriptions to "be written in a manner calculated to be understood by the average plan participant, and [ ] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1); *see also*, 29 C.F.R. § 2520.102–2(a). U.S. Department of Labor regulations require that summary plan descriptions contain a clear statement of circumstances which could result in loss of or ineligibility for "benefits that a participant or beneficiary might otherwise *reasonably expect* the plan to provide on the basis of the description of benefits required by . . . this section." 20 C.F.R. § 2520.102–3(1) (emphasis added); *see also*, 29 U.S.C. § 1022(b) (plan and SPD must indicate "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits").

■ I reject GM's argument that the phrase "benefits applicable to me" in the statements of acceptance must be interpreted to refer exclusively to pension benefits. Much of the benefits information provided to employees as they considered early retirement was not limited to pension benefits. On the contrary, these documents almost uniformly included descriptions of GM's Savings–Stock Purchase Program, the Employee Stock Ownership Plan, life insurance, accidental death benefits and, importantly, health insurance. The Morris Memorandum, (Pl.Ex. 420, discussed in section VI(A),

above), is a good example. Morris stressed the importance of providing potential early retirees with "the information the employee and his family may need to make a well informed decision regarding early retirement." In an attached list of "important considerations," Morris mentions lifetime health care benefits at no cost. Many of the sample group retirees received the attachment, an indication of its wide distribution. Furthermore, other evidence demonstrates a company policy of providing information on health care to employees during retirement interviews. (*See, e.g.,* Pl.Ex. 409, discussed above in Section V(B).)

Since GM emphatically denies that it ever promised lifetime benefits without cost to its early retirees to induce them to retire, the Morris Memorandum is troubling because it seems, then, to be deceptive. Morris explicitly advised the personnel directors at all GM facilities to stress the importance of full health care coverage in retirement without cost to all employees considering early retirement, but he failed to mention the possibility that health care benefits could be reduced or even eliminated after the employee retired. Other evidence also overwhelming demonstrates that this negative possibility was rarely mentioned to potential retirees, while the advantages of lifetime health care benefits at no cost was actively stressed.

GM used imprecise language when referring to its retirement and health care programs, and must bear the burden of this mistake. As detailed in Section VI, above, health care was often listed as a retirement benefit on documents received by potential early retirees. Even "Your GM Benefits" discusses post-retirement health care in a section devoted to retirement benefits, rather than in the health care section.

Thus, I find that early retirees could and did conclude that health care was part of the early retirement program they agreed to accept; and that GM had reason to believe employees would make such a conclusion. Early retirees received both documents and oral communications that uniformly stressed the value of *all* retirement benefits, including health care.

### D. *What health care benefits were promised?*

Now that I have found that members of the plaintiff class reasonably concluded that health care benefits were included in the early retirement offers, I must determine the extent of those benefits. Before undertaking this analysis, I will summarize the evidence on which I find plaintiff class reasonably relied for information on health care benefits in retirement:

### CENTRAL OFFICE

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | Carl Gabrielson |
| | Told he would have health care for his lifetime at no cost. | |
| 4–11 | Morris Memorandum. | Margaret Greenan |
| 4–61 | Eligible for basic health care for life. | |
| 4–11 | Morris Memorandum. | Brainard Kugler John Lockwood |
| 4–16 | "GM pays the premium for you and your covered dependents for your lifetime." | Joseph Fox |
| 4–17 | "BC/BS will be continued at GM expense." | |
| 4–8 | "Your basic coverages will be provided a Corporation expense for your lifetime." | Robert Bickmyer |
| 4–47 | "Upon retirement, all health care coverages will be continued." | |

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–48 | Blue Cross/Blue Shield paid by GM "for lifetime" at "no cost to retiree." | |
| 4–10 | Blue Cross/Blue Shield will be "continued without cost to you." | |
| 4–8 | [See above.] | Frank Laurenzo |
| 4–10 | [See above.] | |
| 4–30 | "GM pays full cost for lifetime" for Blue Cross/Blue Shield upon retirement. | |
| 4–7 | [See above.] | Rocco Ruggiero |
| 4–8 | [See above.] | |
| 4–10 | [See above.] | |
| 4–7 | "GM pays full cost for Lifetime" for medical insurance. | Dario Breata<br>Helmut Heisinger |
| 4–8 | [See above.] | |
| 4–7 | [See above.] | William Cooney |
| 4–8 | [See above.] | |
| 4–9 | GM pays for Blue Cross/Blue Shield during retirement. | |

## GENERAL MOTORS ASSEMBLY DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–1 | Basic health insurance paid by GM for "lifetime" of retiree. | Clinton Burns |
| 4–2 | "Your basic health insurance is paid up for you and your spouse for the rest of both of your lives." | |
| 4–1 | [See above.] | Donald Nesbit |
| | Walter Huppenbauer consistently told retirees "basic health insurance for the rest of their life free ..." | South Gate retirees from 1974 to 1981 |
| 4–42 | "Health care coverages are continued for you and your eligible dependents for your lifetime, with General Motors paying the full cost...." | Armand Petrolina |
| 4–3 | "Blue Cross or Kaiser—Employee covered at no cost to employee." | Anthony Boldizar<br>Bresse Dame<br>Kenneth Engle<br>Michael Fernicola<br>Anne Glick<br>Earl Gordon<br>Junior Rehor<br>Leroy Tunistra<br>Donald Allan<br>Henry Calderon<br>Patrick Callahan |
| | Told by Anne Glick that "whatever was on the sheet [Pl.Ex. 4–3] is what they are entitled to in their retirement for the | Retirees at Van Nuys Assembly in 1979. |

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| | rest of their lives at no expense to them." | |
| | M. Scott Pruyn told retirees they would continue to have same health care program they had as employees as long as they lived, at no cost to them. "I was told that was General Motors' policy from practically every personnel director that I worked for...." | Retirees at Van Nuys Assembly from 1974 to 1977. |
| 4–11 | Morris Memorandum. | Elsie Winters |
| 4–34 | Basic health insurance "continue for self + dependent for life." | Lionel Brace |

### CHEVROLET DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum | Carl Gabrielson Walter Hultquist Ken Richardson |
| | Wayne Riedel, a personnel supervisor, told early retirees that "hospital and medical insurance would be paid by the corporation in full, and if they should die first, the full benefit would pass on to their surviving spouse." | Employees at Chevrolet–Toledo |

### CHEVROLET–PONTIAC–CANADA GROUP

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–51 | "All health care coverage will be continued" upon retirement. | Ronald Conrow |
| 4–52 | "All health care coverage will be continued" upon retirement. | Carl Brown |
| 4–49 | "Upon retirement ... all health care coverage will be continued, at corporation expense." | |
| 4–49 | [See above.] | James Baker |
| 4–39 | "Upon retirement, all health care coverages will be continued at Corporation expense." | Sam Emerick |
| 4–40 | "Upon retirement, all health care coverages will be continued." | |
| 4–40 | [See above.] | Richard Hayes Donald Pavelsak |
| 4–50 | "Benefits continued for life at no cost to employe." | Roy Karp Edward Miketo Roy Abbott |

## DELCO AND AC SPARK PLUG

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–5 | Provided with BC/BS and Prescription Drug Program coverages without cost for lifetime. | Francis Doonan |
| 4–6 | "Upon retirement free Blue Cross—Blue Shield for you and your spouse for your lifetimes." | |
| 4–4 | "Upon retirement all health care coverages will be continued at corporation expense." | Wilbur Oakley |
| 4–11 | Morris Memorandum. | Pauline Holt<br>Harold Bourcier<br>John Homola<br>O. David Nelson |
| 4–11 | Morris Memorandum. | Edmond Burnside<br>G. Dombrowski |
| 4–12 | After retirement coverages will be continued at no cost to retiree. | John Sheppke |
| 4–13 | "Coverage after retirement will be continued at no cost to employe."<br><br>Schwerzel stressed to Burnside advantages of free health care benefits in retirement. "This was the big benefit that he [Schwerzel] preached and preached and preached down here, and I was very insistent on it." | |
| 4–12 | [See above.] | Billie Gates |
| 4–13 | [See above.] | George Hamilton |
| | O. David Nelson, Plant Manager, told early retirees that the benefits "they then had would continue and that there would be basically no increase in the cost to them for their lifetime...." | Employees at Delco plant in Olathe, KA |
| 4–35 | "GM pays for the full cost of coverage for the retiree ... and for his eligible dependents...." | Charles Meyers<br>Robert Forst |

## DETROIT DIESEL ALLISON DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | James Bruce<br>Paul Onufer |
| 4–18 | "Your company-paid medical insurance coverages remain the same after retirement that you have as an active employee." | Raymond Lucid |
| 4–28 | Hospital/medical, prescription drug, dental, vision and hearing aid coverages provided in retirement "at no cost to retiree." | Ernest Rasmussen<br>Bartlett Cady |

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–28 | [See above.] | Ronald Lund |
|  | Told by personnel representative that he "would have the complete program as it stood on that date for as long as we lived." |  |
| 4–28 | [See above.] | Mary Franklin |
| 4–59 | You will retain health care coverage for life. |  |

## FISHER BODY DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–19 | "Blue Cross/Blue Shield and dental expense are paid for by corporation for life." | Robert MacKinnon Glenn Palmer John Perkins |
|  | Told by supervisor that "I'd have the same coverage at no cost for me and my wife the rest of my life." | Glyn Sadler |
| 4–31 | "Your Blue Cross/Blue Shield and Dental Expense coverages will be continued without cost to you as the Corporation will pay the full cost of this protection subsequent to your retirement." | John Abrinko |
| 4–11 | Morris Memorandum. | Leonard Moeller |
|  | Told by a personnel representative that he would have the same health care benefits for his lifetime as he had while an employee. |  |

## GENERAL MOTORS INSTITUTE

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | Virginia Spencer |
| 4–20 | Health care coverages paid through retirement. |  |

## HARRISON RADIATOR

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–21 | "The Corporation continues to pay full contribution for the retiree, spouse and eligible dependents...." | Frank Disinger |

## HYDRAMATIC/POWERTRAIN DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–22 | Blue Cross will be paid by GM. | Al Petcavage<br>Clifford Thompson<br>Clifford Wilford<br>Lloyd Campbell |
| 4–22 | [See above.] | Bertram Bradley |
| 4–32 | BC/BS "paid by GM for Retiree and Eligible Dependents throughout retirement." | |

## PACKARD ELECTRIC

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–24 | "During retirement, you … will continue to have the same health care program you enjoy today…." Only expense will be for CMEP. | John Gerald<br>Joseph Tori<br>Dale Ackerman<br>William Capito<br>Dorothy Carty |

## PARTS DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–25 | Health care "Fully paid by GM." | Robert Morris<br>Howard Bolerjack |
| 4–11 | Morris Memorandum. | |
| 4–11 | Morris Memorandum. | William Kovarik |

## SAGINAW STEERING GEAR DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–26 | Health care provided by GM or paid for life by GM. | Fred Rehfeld<br>Fran Van Tiflin<br>Marcene Zinz<br>William Alarie<br>John Alarie<br>Thomas Austin<br>Jack Coon<br>Clyde Alexander<br>Mildred Campbell<br>Charles Carder<br>Jack Coon<br>Holston Caldwell<br>Thomas Casey |

## CENTRAL FOUNDRY DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–27 | "GM pays for the full cost of coverage for the retiree...." | Trafton Abbott<br>Thomas Cahape |
| 4–27 | [See above.] | Meredith Robinson |
| 4–53 | Highlights of plan: "Continued health care coverage during retirement." | |
| 4–27 | [See above.] | Thomas Wiegandt |
| 4–64 | GM will pay full cost for retiree. | |

## TEREX DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 115 (d) | "Health care coverages are continued for you and your eligible dependents for your lifetime with GM paying the full cost." | Walter Lampert |
| 4–33 | Health care continued for life at no cost to retiree.<br><br>Told by Director of Sales for North/South America: "Look at your health benefits, continued for life and worth a fortune." | |
| 4–29 | [Same as 115(d) above.] | Ed Plivelich |
| 4–50 | Health care, prescription drug, vision care, dental "continued for life at no cost to employee." | |
| 4–33 | [See above.] | Norman Davis |
| 4–11 | Morris Memorandum. | |
| 4–11 | Morris Memorandum. | Raymond Vincent |

## BUICK MOTOR DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–14 | "Your present coverage will be continued on a Corporation paid basis." | Mary Jane Tigner |
| 4–15 | [Same as 4–14 above.] | Corwin Ballentine<br>Elizabeth Baly<br>D. Heidenberger<br>Ruth Koviak |
| 4–14<br>4–15 | [See above.]<br>[See above.] | Wallace Howe |

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | G. Turmpaugh |
| 4–14 | [See above.] | |
| 4–11 | Morris Memorandum. | John Sullivan |
| 4–15 | [See above.] | |
| 4–58 | "Coverage continued on Corporation paid basis." | Carlin Belville |
| 4–58 | [See above.] | Thomas Stephens |
| 4–40 | "Upon retirement, all health care coverages will be continued." | |

## OLDSMOBILE DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | Robert Brown |

## BUICK–OLDSMOBILE–CADILLAC GROUP

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–43 | "Upon retirement, all health care | Jerome Nosal |
| 4–44 | coverages will be continued at Corporation | Edna Burns |
| 4–46 | expense." | Thomas Loftin |
| | | Charles Smith |
| 4–45 | All health care coverages will be continued. | Daniel Spencer |
| 4–57 | "Upon retirement all health care coverages will be continued at Corporation expense." | N.P. Wuest |
| 4–40 * | "Upon retirement, all health care coverages will be continued." | Gary Johnson |

* Franklin Anderson from the Lansing Product Team, Wilfred Best from the Inland Division, and Richard Berube from GM's Research Laboratories also received this document.

## ELECTRONIC DATA SYSTEMS

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–37 | Health care coverages provided during retirement at GM expense. | Beatrice Kirley |
| 111 (b) & | Noncontributory health care coverage provided after retirement. | Steven Horvath |
| (c) & | Health care coverages will be continued. | |
| (g) | Health care provided at GM expense during retirement. | |
| 111 (e) | "You'll continue the same hospital/medi-cal-surgical benefits in retirement you had as an active employe.... The cost, of course, is entirely paid for by the Corporation." | |

## ENGINEERING

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–38 | "BC/BS will be continued at GM expense." | Frank Caito<br>Albert Abbo |
| 4–38 | [See above.] | Joseph Renvez |
| 4–41 | "Upon retirement, all health care coverages will be continued." | |
| 4–11 | Morris Memorandum. | George Hurst |

## NEW DEPARTURE HYATT BEARINGS DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–54 | "Full basic health care coverages for yourself and eligible dependents are continued for life at no cost to you." | Joseph Miller |
| 4–60 | "Upon retirement, all health care coverages will be continued." | E.M. Chacko |

## TRUCK AND BUS GROUP

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–63 | "As a retiree, you will receive the same health care coverage that you now receive." | Beth DeFlurin<br>Carl Cary |
| 4–63 | [See above.] | Orvil Summers |
| 4–37 | Health care coverages provided during retirement at GM expense. | |
| 4–63 | [See above.]<br><br>When Knight asked if health care benefits could be taken away, he was told to consider his past experience. | Henry Knight |
| 4–63 | [See above.]<br><br>Gussie Green told Cook and others that "we would receive our medical benefits the rest of our life at no cost to us." | Ellis Cook |
| 156 (a), (c) & (d) | Morris Memorandum (revised).<br><br>Hospitalization coverage will be "continued after retirement at no cost to retiree."<br><br>"Health care coverages provided at GM's expense for lifetime." | Roger Hunt |

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–55 | Hospitalization coverage will be "continued after retirement at no cost to retiree." | Robert Benson John Ris Peter Capizzi |
| | Kenneth Titherage told retirees Pickett and White that they would receive the same type of health care and dental coverage in retirement as they had while working, at no cost to them. | Robert Pickett Helen White |
| 4–55 | [See above.] | Bobby Upchurch |
| 4–62 | "Upon retirement, all health care coverages will be continued." | |
| 4–62 | [See above.] | William Wessinger |
| | Kenneth Titherage advised potential retirees that "health care would continue in retirement, as we had been accustomed to it during working days, and at no cost to the employee." | Retirees in the Truck & Bus Engineering Dept. between 1974 and 1987. |
| 170 | [Same as 4–55 above.] | Kenneth Titherage |

## ROCHESTER PRODUCTS DIVISION

| Pl.Ex. | Information Received | Retiree |
|---|---|---|
| 4–11 | Morris Memorandum. | Albert Henry |

Both the written and oral representations made to early retirees were made by GM employees with actual, or apparent, authority to bind GM. *See Richards v. General Motors Corp.*, 991 F.2d 1227, 1232 (6th Cir. 1993):

[A]pparent authority may attach even when the agent's acts are unauthorized. The commentary to § 159 of the Restatement [ (Second) of Agency (1983) ], which defines apparent authority, states that "when a principal refers others to an agent . . . for information, such person becomes the spokesman for the principal to them, with apparent authority to make statements upon the subject matter as to which reference is made, and the principal is bound by such apparently authorized statements or promises." *Id.* at § 159 cmt. *f.* Defendants admitted that questions about benefits were appropriately directed to an employee's personnel office or supervisor.

Indeed, "GM does not argue that the benefit descriptions which simply summarized the plan were not authorized." (GM's Reply to Plaintiffs' Post–Trial Brief at 27.)

Although various formulations exist, virtually all of the benefit explanations provided to the early retirees by GM contain statements regarding both the duration of health care benefits ("for life," "during retirement," "continued after retirement," "lifetime," "will be continued," "for the rest of your lives"); and the cost of the benefits ("no cost to retiree," "paid up," "at corporation expense," "without cost," "free," "GM pays full cost," "corporation paid basis," "at GM's expense," "paid for life by General Motors," "fully paid by GM").

Plaintiffs argue that phrases such as "Full basic health care coverages for the retiree and eligible dependents are continued for life at no cost to the retiree," (*see, e.g.,* Pl.Ex. 420, Morris Memorandum), have one clear meaning: the coverages the retiree came to expect as an employee will be continued for life at no additional cost to the retiree. GM argues that "no cost" means no premiums; and that, at the very least, GM was free to impose increased co-payments and deductibles on retirees.[21]

The court in *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 614 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986), concluded that "during the life of the pensioner" "clearly means that a pensioner will receive health benefits for the remainder of his life. . . ." GM repeatedly used the lifetime language. It appears in many of the benefit summaries relied on by plaintiff class, in addition to the SPDs. In addition, GM supervisors and personnel representatives often assured potential retirees that health care would be provided for their lifetimes.

Interpretation of "no cost" is slightly more complex. Every GM executive who testified, whether called by GM or plaintiffs, claimed that "no cost" means no premium cost. However, at least one executive acknowledged that the phrase is ambiguous. (Tr. V(B) at 63, Ryan.) GM also argues that employees could not reasonably assume that "no cost" means no out-of-pocket expenses (such as those associated with co-payments and deductibles), because the health plan included co-payments and/or deductibles for many years before the changes made in 1988. Plaintiffs respond that the "line item" co-payments required before the 1988 changes were insignificant in light of the across-the-board increase in cost associated with the 1988 changes.

GM consistently used formulations such as "at GM expense" and "at no cost to the retiree," without any qualification that "no cost" was confined to the payment of premiums. Employees were never told that "full cost" meant only premiums or subscription charges, and never told how these charges were computed. (Tr. XIII(A) at 10–11, 33, Sherman.) The restriction to the meaning of "no cost" asserted by GM loses even more force once GM became self-insured.[22]

GM executives acknowledged that the co-payments and deductibles imposed in 1988 were major changes. For example, in response to an earlier statement made by O'Brien that no co-payments or deductibles were imposed for "basic" health care from 1964 through 1987, he explained:

> When I was speaking of that particular item, I was commenting in my mind on the—on the broad co-pays and deductibles that we introduced in—in 1988. We did not have those prior to 1988.

(Tr. VIII(B) at 53; *see also* Tr. I(A) at 53–54, Eavenson; Tr. VI(A) at 25–26, Snyder; Tr. XII(B) at 45–46, Sherman.) O'Brien also acknowledged that the 1988 changes were viewed as "major" by top corporate executives. (*Id.* at 61–62.) And GM administrative documents confirmed that the imposition of co-payments and deductibles was a major departure from past practice. (*See, e.g.,* Pl. Ex. 273 at bates stamp 1124, "introduction of co-pays and deductibles on traditional coverage"; Pl.Ex. 296 at Exhibit I, p. 7, "structure of the Traditional health care option will change to include deductibles and copayments"; Pl.Ex. 300, referring to "imposition" of deductibles and co-payments as a "major change.")

Historically, GM imposed small co-payments on vision and prescription drug coverage, small co-payments on outpatient psychiatric treatment after five visits, and a range of co-payments on various dental services. Hospital, surgical and medical coverages (excluding psychiatric care), however, operated

---

**21.** GM also argues that, due to its reserved right to amend the plan, it is also free to impose cost-sharing of the premium, and even to eliminate health care entirely.

**22.** Despite GM's contention that "no cost" means no premium cost, it has reneged on even

that limited commitment. In changes implemented after the filing of this lawsuit, GM requires monthly contributions from early retirees for health care coverage on top of deductibles and co-payments. (Pl.Exs. 65, 66; Tr. IX(A) at 60–61, O'Brien.)

on a "first dollar coverage" principle. (*See, e.g.,* Pl.Ex. 277 at 4, Pre–1988 coverage "provides first dollar fee-for-service coverage for basic hospital, surgical, and medical care and is supplemented by CMEP.") "First dollar coverage" indicates that coverage begins as soon as the first dollar is expended. The beneficiary is not required to meet a deductible or make a co-payment. (*See* Tr. VIII(B) at 59, O'Brien.) The 1988 changes eliminated first dollar coverage for the traditional option. (*Id.* at 61.)

The substantive difference between the line item co-payments retirees were accustomed to paying, and program-wide deductibles and co-payments imposed in 1988, is further illustrated by the fact that the original line item co-payments continued to be charged separately even after the major changes in deductibles and co-payments were imposed in 1988. (*See* Pl.Exs. 33 at 17, 34 at 21–22, 251 at 6.) The line item co-payments on particular services simply did not sanction the across-the-board deductibles and co-payments imposed beginning in 1988.

Furthermore, early retirees recognized that "no cost" did not mean the elimination of already in place line item co-payments. They understood the promise to consist of a commitment not to reduce coverages or impose additional costs. For example, Walter Lampert, a Terex Division early retiree, understood the promise to be that "coverage then in existence would continue for the lifetime of myself and my spouse." (Tr. VI(A) at 41, 62.) When Ronald Lund, a Detroit Diesel Allison retiree, asked a personnel representative about the meaning of "no cost," he was advised that it meant no additional cost for the rest of his life. (Tr. IV(B) at 18.) And O. David Nelson, a plant manager in Olathe, Kansas, told early retirees "that the benefits that they then had would continue and that there would be basically no increase in the cost to them for their lifetime...." (Tr. III(B) at 18.) (*See also* Tr. II(A) at 36, Huppenbauer; Tr. II(B) at 33, 37, 47, Titherage; Tr. II(B) at 70, Gabrielson; Tr. III(A) at 57, Pruyn; Tr. IV(B) at 39, Cook; Tr. V(A) at 72, Horvath; Tr. VII(A) at 41, Moeller.) Furthermore, some of the benefit summaries include language more directly in line

with this interpretation. (*See, e.g.,* Pl.Exs. 104(b) and 113(a), "As a retiree, you will receive the same health care coverage that you now receive.")

I repeat my conclusion: The documentary and testimonial evidence demonstrates that the health care benefits existing at the time of early retirement would continue for the life of the early retiree and surviving spouse; and that the cost of such benefits would not be shifted to the early retiree. This includes hospital, surgical and medical coverages, in addition to prescription drugs, vision, dental and hearing aid coverage where applicable. CMEP must also be continued. The early retiree will be obligated to pay the cost of CMEP commensurate to the cost of this benefit at the time of retirement.

## VIII. *CONCLUSION*

The 1988 health care benefit modifications implemented by GM—principally the imposition of program-wide deductibles and co-payments of up to $750 per year under the traditional option—breach the contract to provide health care benefits for life at no cost to the early retirees.

Alternatively, the early retirement agreements modified the general health care plan in favor of early retirees to prevent GM from exercising its right to make adverse plan changes; and the changes challenged by plaintiff class violate the terms of the plan as modified by the early retirement agreements.

An order of judgment may be presented.